IN THE IOWA DISTRICT COURT IN AND FOR LINN COUNTY

| | |
|---|---|
| SHARON BERTROCHE, M.D., | Case No.  LACV086485 |
| Plaintiff, | |
| vs. | **PETITION AT LAW** |
| MERCY PHYSICIAN ASSOCIATES, INC., | |
| Defendant. | |

Plaintiff, Sharon Bertroche, M.D. ("Dr. Bertroche") for her cause of action against Mercy Physician Associates, Inc. ("MPA"), states:

## COMMON ALLEGATIONS

1.      Dr. Bertroche is a physician licensed to practice medicine in the State of Iowa.  At all relevant times, Dr. Bertroche has been a resident of Linn County, Iowa.

2.      MPA is a corporation organized and existing under the laws of the State of Iowa, with its principal place of business at 701 10th Street SE, Cedar Rapids, Linn County, Iowa.

3.      Dr. Bertroche and MPA entered into a "Primary Care Physician Employment Agreement" and an Addendum to Primary Care Physician Employment Agreement (collectively, "the Employment Agreement") in May, 2006 and January, 2007, respectively. A copy of the Employment Agreement is attached to this petition as Exhibit A and incorporated by this reference.

4.      As provided in Section 6.2 of the Employment Agreement, MPA agreed to employ Dr. Bertroche as a physician for an initial term of five years and successive two-year terms unless either party provided written notice of termination.  The Employment Agreement remained in effect until Dr. Bertroche provided Notice of Termination on or about March 1, 2016, effective on April 30, 2016.

5.     As provided in Section II(B) of Exhibit "B" to the Employment Agreement, MPA agreed to pay Dr. Bertroche compensation based upon a mutually-determined amount of Dr. Bertroche's anticipated annual compensation for the next contractual year, with a draw to be made in equal installments every two weeks.  Each contractual year commenced on July 1 and ended on June 30 of the following calendar year.

6.     As further provided in Section II(B) of Exhibit "B," reconciliation between Dr. Bertroche's draw amount and the amount actually earned by her under the "Team Bonus System" was to occur on a quarterly basis.

7.     As further detailed in Section III (B) of the Employment Agreement, following the conclusion of each quarterly reconciliation, when the "Profit Center Balance" was a positive number (reflecting a surplus) Dr. Bertroche was to receive at that time a portion of the profit as her share of the team bonus.

8.     Under the Employment Agreement, all amounts that MPA owed to Dr. Bertroche in addition to draws were due and owing to her immediately following completion of the quarterly reconciliation at the beginning of the each fiscal quarter.

9.     Contrary to the terms of the Employment Agreement, MPA did not pay Dr. Bertroche bonus payments following quarterly reconciliations.

10.     In addition, MPA has not provided a complete itemization and reconciliation of all compensation owing to Dr. Bertroche, and has not paid to Dr. Bertroche all compensation owing to her.

11.     As a result of MPA's failure to follow the Employment Agreement, MPA owes but has not paid compensation owing to Dr. Bertroche.

12.     MPA acknowledges that it owes Dr. Bertroche compensation of $43,149.00.

13.     Despite acknowledging that it has owed compensation of $43,149.00, MPA has intentionally failed and refused to pay that compensation. In addition, as a condition of paying this compensation to Dr. Bertroche, MPA has demanded that she sign a release and settlement agreement releasing MPA and its affiliates from all liability for any claims relating to her employment with MPA.

14.     MPA's failure and refusal to timely, fully and unconditionally pay compensation owing to Dr. Bertroche under the Employment Agreement is intentional.

**COUNT I**
**CLAIMS UNDER IOWA CODE CHAPTER 91A**

15.     Dr. Bertroche realleges and incorporates by this reference paragraphs 1 through 14 above.

16.     The payments that MPA owes to Dr. Bertroche are wages under Iowa Code § 91A.2(7).

17.     Pursuant to Iowa Code § 91A.3, and the terms of the Employment Agreement, all wages owing to Dr. Bertroche were due and owing at the next regular payday following the quarterly period in which the wages were earned.  In addition, pursuant to Iowa Code § 91A.4 and the Employment Agreement, all wages owing to Dr. Bertroche were due and owing no later than 30 days after the next regular payday following the termination of her employment, or by May 30, 2016.

18.     Under Iowa Code § 91A.7, MPA was obligated "without condition" to pay and reimburse Dr. Bertroche for all wages and expenses, less lawful deductions, that were "conceded to be due."

19.     MPA's intentional failure and refusal to pay Dr. Bertroche without condition compensation conceded to be due to her is in violation of Iowa Code §§ 91A.7 and 91.8.

3

20.     As provided in Iowa Code § 91A.8, MPA is liable to Dr. Bertroche for all unpaid wages and expenses, in the minimum undisputed amount of $43,149.00, plus liquidated damages in an equal amount as provided in Iowa Code §§ 91A.2(6) and 91.8, court costs and attorney's fees.

WHEREFORE, Sharon Bertroche, M.D., requests that the Court enter judgment against Mercy Physician Associates, Inc., for unpaid wages in an amount that will fairly and equitably compensate her, together with liquidated damages, attorney's fees, for interest as provided by law, and for the costs of this action.

## COUNT II
## CLAIM FOR BREACH OF CONTRACT

21.     Dr. Bertroche realleges and incorporates by this reference paragraphs 1 through 20 above.

22.     MPA has breached the Employment Agreement.

23.     MPA's breach of the Employment Agreement is a proximate cause of damages suffered by Dr. Bertroche.

WHEREFORE, Sharon Bertroche, M.D., requests that the Court enter judgment against Mercy Physician Associates, Inc., in an amount that will fairly and equitably compensate her for her losses, for interest as provided by law, and for the costs of this action.

_/s/_  Brad J. Brady
Brad J. Brady, AT0001138
Ann C. Gronlund, AT0010933
BRADY PRESTON BROWN PC
2735 1st Avenue SE
Cedar Rapids, IA 52402
Phone: 319/866-9277
Fax:  319/866-9280
BBrady@BradyPrestonBrown.com
ATTORNEYS FOR PLAINTIFF

4

## PRIMARY CARE PHYSICIAN EMPLOYMENT AGREEMENT

THIS AGREEMENT is entered into the day and year set forth below by and between Mercy Physician Associates, Inc., an Iowa corporation (hereinafter "MPA") and Sharon Bertroche, M.D. (hereinafter "Physician").

WHEREAS, MPA and Mercy Physician Services, Inc. own and operate a primary care network that provides quality, accessible, and cost-effective health care throughout eastern Iowa, including medically-underserved communities;

WHEREAS, MPA offers its primary care physicians the ability to practice their profession relieved of the responsibility of supervising and managing the operations of the office in order to achieve the maximum efficiency and economy in the delivery of health care to patients;

WHEREAS, Physician is qualified by virtue of education, licensure and experience to practice medicine as an employee of MPA in its primary care network and MPA desires to employ Physician to provide professional medical services to its patients;

WHEREAS, Physician desires to practice medicine as an employee of MPA in its primary care network; and

WHEREAS, MPA and Physician desire to enter into this written Agreement in order to set forth a full statement of their duties and responsibilities in this regard;

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

### ARTICLE I
### EMPLOYER-EMPLOYEE RELATIONSHIP

Section 1.1 **Employment.** Subject to the terms and conditions of this Agreement and approval by Mercycare Service Corporation and its Corporate Compliance Committee, MPA hereby employs Physician, and Physician hereby accepts such employment and agrees to serve MPA as a physician in MPA's primary care network. It is hereby mutually understood and agreed that Physician is at all times an employee of MPA and not an independent contractor or partner of MPA in performance of Physician's obligations under this Agreement. Physician agrees that he/she is an exempt employee for wage and hour regulations purposes. All prior agreements between MPA and Physician regarding Physician's employment with MPA are hereby rescinded and rendered null and void.

F:\TLM\MERCY\MPA\EmploymentKs\Bertroche-K-PrimaryCare-4-11-06.doc

Section 1.2 ***Compliance with Corporate Practice of Medicine Law.***
Nothing in this Agreement shall be construed to violate the state corporate practice of medicine law. In accord therewith, MPA shall neither have nor exercise any control or direction over Physician's clinical judgment and Physician shall exercise independent professional medical judgment in the care of MPA patients.

## ARTICLE II
## PHYSICIAN'S REPRESENTATIONS AND WARRANTIES

Section 2.1 ***Physician's Representations & Warranties.*** Physician hereby makes the following representations and warrants that these representations are true as of the date hereof and as of the Employment Start Date, and further warrants that these representations will remain true during the course of this Agreement:

(a) Physician is licensed to practice medicine without restriction or limitation in the State of Iowa, is board eligible or board certified, and is registered with the Federal Drug Enforcement Agency to prescribe controlled substances without restriction or limitation. Neither the Physician's license to practice medicine, board eligibility/certification, nor the Physician's registration has ever been suspended, revoked, restricted, limited or terminated. Physician has never been subjected to the imposition of any type of disciplinary or corrective action taken by any medical licensing or certification authority, or any reprimand or monetary fine or penalty imposed by any medical licensing or certification authority relating to the rendering of medical services by Physician. No investigations, warnings, reprimands, impositions of probation or other actions are pending or threatened in connection therewith.

(b) Physician is under no obligation, restriction or limitation, contractual or otherwise, to any other individual or entity that would prohibit or impede Physician from undertaking and performing the duties under this Agreement and Physician is free to enter into and perform the terms and provisions hereof.

(c) Physician is under no physical or mental disability that would hinder Physician's ability to perform the duties required of Physician under this Agreement.

(d) Physician has provided evidence to MPA of professional liability insurance acceptable to MPA to insure against malpractice claims arising out of any and all occurrences Physician may have had prior to the Employment Start Date.

(e) Physician is neither a partner, officer, agent nor independent contractor of MPA or any of its affiliates, nor does Physician receive any compensation, fee, benefit or payment of any kind from MPA or its affiliates, other than as set forth herein.

(f) Physician has never been removed for cause from any provider panel of any managed care organization, indemnity insurer or other third-party payor, or independent practice association, physician organization, physician-hospital organization

or other provider network and no investigation or proceeding is pending in connection therewith.

(g) Physician is not a party to any pending malpractice or other patient-related litigation, nor has any such litigation been threatened.

(h) Physician's medical staff membership or privileges have never been suspended, restricted, limited, revoked or terminated at any hospital, nor is Physician subject to any threatened or pending investigation or proceeding that could lead to suspension, restriction, limitation, revocation or termination of Physician's medical staff membership or privileges at any hospital.

(i) Physician has never been convicted of (i) any offense related to the delivery of an item or service under the Medicare or Medicaid programs; (ii) a criminal offense relating to neglect or abuse of patients in connection with the delivery of a health care item or service; (iii) fraud, theft, embezzlement or other financial misconduct in connection with the delivery of a health care item or service; (iv) obstructing an investigation of any crime referred to in (i) through (iii) of this subsection; or (v) the unlawful manufacture, distribution, prescription or dispensing of a controlled substance, nor is any investigation or proceeding pending in connection therewith.

(j) Physician has never been required to pay any civil monetary penalty under 42 U.S.C. §1128A regarding false, fraudulent or impermissible claims caused by Physician that may result in payments under, or payments to induce a reduction or limitation of, health care services to beneficiaries of any state or federal health program, nor is any investigation or proceeding pending in connection therewith.

(k) Physician has never been excluded from participation in the Medicare or Medicaid program, nor is there any investigation or proceeding pending in connection therewith.

(l) Neither Physician nor Physician's immediate family (spouse, biological or adoptive parent, child, sibling, stepparent, stepchild, stepbrother, stepsister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, grandchild and spouse of a grandparent or grandchild) has a "financial relationship" (including an employment relationship) with MPA within the meaning of 42 U.S.C. 1395nn (Stark Law) that does not fall within a statutory or regulatory exception to the physician self-referral prohibition, whether or not memorialized in writing.

(m) Neither the National Practitioner Data Bank nor the Healthcare Integrity and Protection Data Bank contain information about Physician that would raise any serious issues concerning the professional conduct of Physician that are not explained to MPA's satisfaction.

Section 2.2 **Duty to Notify.** Physician agrees to immediately notify MPA orally, followed by written notification, in the event any of the foregoing representations and warranties are no longer true (hereinafter, an "Adverse Event").

## ARTICLE III
## PHYSICIAN'S DUTIES

Section 3.1 **Essential Functions.** The essential functions of Physician's job are set forth in Exhibit "A" attached hereto and by this reference incorporated herein. Physician shall report to the MPA Board (or such person designated by MPA) and shall perform said duties in a cooperative and courteous fashion.

Section 3.2 **Relieving Physician of Duties.** MPA may relieve Physician of said duties without pay in the event any Adverse Event relating to any of the matters set forth in §2.1 shall occur or during any period when Physician fails or refuses, for reasons other than disability, to continue to perform the duties set forth in Exhibit "A". MPA may relieve Physician of said duties with pay during any period when MPA deems that doing so is in the best interests of MPA or its patients. Such action may, but need not, coincide with a notice of termination.

Section 3.3 **Time Devoted to Physician's Duties.** Physician will perform the duties set forth in Exhibit "A" on a full-time basis (160 hours per month on average) and will refrain from practicing medicine or otherwise engaging in outside activities for compensation during the term of this Agreement as set forth in §§3.4 and 3.5, below, except as MPA's Executive Director otherwise approves in writing.

Section 3.4 **Other Contracts.** Physician warrants that a copy of all contracts relating to the provision of Professional Medical Services and medical director and other administrative services, including but not limited to those for contracts with nursing homes, hospitals, managed care plans and the like (hereinafter "Administrative Services") and professional speaking engagements and in-services (hereinafter "Other Professional Activities"), which provide professional income directly to Physician or an entity owned by Physician, have been provided to MPA prior to the execution of this Agreement. Said contracts will be reviewed by MPA and a decision will be made whether the contract should continue, and if the contract continues, whether the income under the contract will be paid to MPA or Physician. New contracts and renewals of existing contracts, and the allocation of income there from, must be approved by MPA in writing.

Section 3.5 **Covenant not to Compete.** (a) Physician warrants that during the term of this Agreement and for a one (1) year period following termination of Physician's employment with MPA, Physician will not directly or indirectly engage in the practice of medicine in any capacity or serve as an owner, officer, partner, shareholder, member or director of, or have any ownership or control interest in, any organization or entity that provides health care services in competition with MPA or any affiliate of MPA in Linn County, Iowa or any other county in which MPA or an affiliate of MPA provides health care services, without MPA's express written consent.

(b) Physician also warrants that for a two (2) year period following termination of Physician's employment with MPA, Physician will not directly or indirectly disrupt or attempt to disrupt the relationship, contractual or otherwise, between MPA or an affiliate of MPA and any patient, third party payor (including all managed care contractors), supplier or employee of MPA or any of MPA's affiliates. Physician is specifically prohibited from contacting or soliciting the business of Physician's former practice or patients, but is permitted general public announcements of the location of Physician's new office in the Yellow Pages, directories, newspapers or other widely-distributed media.

(c) The parties acknowledge that the geographic and practice restrictions under this section and the period of such restrictions are reasonable and necessary for the adequate protection of the legitimate business interests of MPA and its affiliates and that these restrictions do not unduly restrict Physician from earning a livelihood. Physician agrees that a violation of this section will cause irreparable harm and injury to MPA and/or its affiliates, which is extremely difficult or impossible to ascertain, and that any remedy at law will be inadequate. Accordingly, Physician agrees that MPA shall be entitled to an injunction issued out of any court of competent jurisdiction enjoining or restraining Physician from continuing to do any act or commit any violation or threatened violation of these restrictions, in addition to any money damages that might occur, all reasonable attorney fees incurred by MPA due to Physician's violation of these restrictions and any other rights and remedies that MPA may have.

(d) In the event that the period of time, the scope of restricted business activity or the geographic area described herein is deemed by any court of competent jurisdiction to be too broad to be enforceable, then any such restriction as to time, scope or geographic area shall be limited to the narrowest extent required to make such restriction enforceable, and as so limited, shall be fully enforceable against Physician.

## ARTICLE IV
## ADMINISTRATIVE MATTERS

Section 4.1 ***Office space, equipment, furniture, supplies, etc.*** MPA shall provide or arrange to provide office space for Physician at its MercyCare Marion Clinic (hereinafter the "Clinic"), which shall be furnished with all equipment, furniture, supplies and materials reasonably necessary for Physician to perform the duties required hereunder. Moreover, MPA shall provide or arrange to provide the repairs and support services for said equipment and furniture.

Section 4.2 ***Office staff and administrative services.*** (a) MPA shall provide or arrange to provide and administratively supervise all personnel reasonably necessary to staff the Clinic, including an office manager, nurses, receptionists, transcriptionists and bookkeepers. MPA agrees to consult with Physician with regard to the quantity, qualifications, hiring, evaluation, discipline and termination of said personnel.

(b) MPA shall provide or arrange to provide all administrative services reasonably necessary for the operation of the Clinic, including but not limited to personnel management and training, up-to-date policy and procedure manuals, quality improvement and risk management services, billing and collections, accounts payable, office financial reports and statistical information, and promotion of the MPA network in the community.

Section 4.3 **Physicians and Physician Extenders.** MPA shall use its best efforts to employ those qualified physicians and physician extenders reasonably necessary to assist Physician in the performance of the duties required hereunder and to provide coverage for Physician during time off duty.

Section 4.4 **Financial matters.** (a) MPA shall consult with Physician to develop the Clinic budget.

(b) Setting, billing, and collecting the fees charged for Physician's services shall be the responsibility of MPA, which shall consult with Physician as appropriate. Notwithstanding the foregoing, Physician shall retain sole responsibility for accurate coding of services provided by or supervised by Physician and for timely and accurate documentation of such services as necessary to facilitate reimbursement and withstand audit scrutiny by payors.

(c) All fees, revenue, receipts, honorariums and income of any kind generated or produced by Physician that relate to Physician's practice of medicine, including but not limited to the provision of Professional Medical Services, Administrative Services and Other Professional Activities, shall be the property of MPA and considered part of Physician's Net Practice Revenue (as defined in Exhibit "B"), whether paid directly to MPA or Physician, unless express written consent is given in advance by MPA's Board of Directors for Physician to retain same. Notwithstanding the foregoing, any honorarium for Other Professional Activities conducted outside Physician's normal office hours may be paid directly to and retained by Physician.

(d) Physician may be required (and agrees promptly upon request of MPA to do so) to render a true accounting of all transactions relating to Physician's services rendered during the term of this Agreement (and any renewals or extensions thereof). MPA may request such accounting at any time during the term of this Agreement and any renewals or extensions thereof and for a period of up to one (1) year after termination, regardless of how such termination may occur.

(e) MPA agrees to provide Physician with periodic reports of all billing and collection activities (including coding) relating to Physician, which shall contain sufficient information to enable Physician to make a determination regarding their accuracy. Said reports shall be deemed to be verified by Physician as accurate unless Physician submits a written report to MPA within 30 days of the issuance of the report identifying any inaccuracies.

(f) Physician shall appoint MPA as Physician's attorney-in-fact to endorse, negotiate and cash any and all checks or other written instruments or evidences of indebtedness payable to Physician by patients and third-party payors for Professional Medical Services, Administrative Services and Other Professional Activities performed by Physician. Said power of attorney shall continue for the term of this Agreement and thereafter until all such checks or other instruments executed under circumstances governed by this Agreement are fully paid.

Section 4.5 **Key-Person Insurance Authorization.** At any time during the term of this Agreement, MPA shall have the right to insure the life of Physician for the sole benefit of MPA. The amount of such insurance and the type of policy taken out shall be determined by MPA, and all premiums payable thereon shall be the sole obligation of MPA. Physician shall have no interest in any such policy, but shall cooperate with MPA in taking out such insurance by submitting to physical examination, by supplying all information required by the insurance company, and by executing all necessary documents, provided no financial obligation is imposed upon Physician for any such documents.

### ARTICLE V
### COMPENSATION AND BENEFITS

Section 5.1 **Compensation and Benefits.** Physician shall be compensated and shall receive benefits according to the terms set forth in Exhibit "B" attached hereto and by this reference incorporated herein.

Section 5.2 **No Referral Required.** The parties acknowledge that the compensation represents fair market value in arms-length transaction for the services provided by Physician. Nothing in this Agreement shall be construed as to induce or require either party to make referrals to the other or any item or service that may be payable by a state or federal health care program.

Section 5.3 **Taxes.** MPA, as Physician's employer, shall be responsible for making all required withholdings and paying all taxes required of employers under federal and state law. MPA shall provide Physician with an annual W-2 form for income tax purposes as required by law.

### ARTICLE VI
### EMPLOYMENT START DATE, TERM AND TERMINATION

Section 6.1 **Employment Start Date.** The first day of Physician's employment (hereinafter "Employment Start Date") shall be October 1, 2006.

Section 6.2 **Term.** This Agreement shall commence on the Employment Start Date and shall continue in full force and effect for five (5) years (hereinafter the "Initial Term"), and thereafter shall automatically renew for successive two (2) year terms unless either party gives the other written notice at least one hundred eighty (180) days prior to

the expiration date of the initial term or any successive terms of the terminating party's intention to terminate this Agreement or one of the events described in §6.3 occurs.

Section 6.3 **Termination.** (a) After the first contractual year, this Agreement may be terminated at any time for any reason upon the mutual agreement of the parties.

(b) After the first contractual year, this Agreement may be terminated by either party for any reason or no reason by giving the other party at least one hundred eighty (180) days prior written notice of the terminating party's intention to terminate this Agreement;

(c) This Agreement may be terminated immediately by MPA upon the occurrence of any of the following events:

> (i) in the event an Adverse Event as set forth in Article II occurs in relation to Physician;
>
> (ii) in the event of Physician's death; or
>
> (iii) in the event MPA ceases to do business.

(d) This Agreement may be terminated at any time by either party if, in the terminating party's reasonable opinion, the other party has defaulted in the performance of its duties hereunder, provided that, if it is reasonably possible to cure such default, notice of the default has been given to the other party, at least thirty (30) days have elapsed since the notice was given and the other party has failed to cure the default within that time period. If, however, steps cannot reasonably be taken to remedy such default, either party may immediately terminate this Agreement. Neither party shall be deemed to be in default for any delay or failure in performance under this Agreement or other interruption of service or employment deemed resulting, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation, strikes or other work interruptions by either party's employees, or any similar or dissimilar cause beyond the reasonable control of either party.

(e) In the event the MPA Board determines that Physician has defaulted in the performance of his/her duties hereunder, then MPA may immediately terminate this Agreement without providing notice to cure as set forth above if (i) such default is due to Physician's failure to perform his/her duties within the scope of Physician's license in strict conformity with recognized standards of care in a competent, ethical and professional manner and/or in a manner consistent with the Principles of Medical Ethics of the American Medical Association, (ii) such default is due to non-compliance with any MercyCare Service Corporation Compliance Plan provision, or (iii) it is reasonably foreseeable that Physician's default could threaten MPA's Medicare/Medicaid provider status, tax-exempt status of MPA's affiliated corporations or subject MPA to civil, administrative or criminal penalties, fines or other sanctions.

(f) If, in the reasonable opinion of either party, at any time any term of this Agreement could be deemed by a court or governmental authority to violate federal, state, or local law or regulation, could jeopardize the federal tax-exempt status under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, of any of MPA's affiliated corporations with such status, or could result in revocation of either party's Medicare provider status, then the parties shall exercise their best efforts to accommodate the terms and intent of this Agreement to the greatest extent possible consistent with the requirements of law. If, however, steps cannot promptly be taken to remedy such problem or the parties have unsuccessfully employed their best efforts for a period of thirty (30) days to renegotiate the terms of this Agreement, this Agreement may be immediately terminated by either party.

(g) If any federal, state or local government or agency passes, issues, interprets, or promulgates any law, rule, regulation, standard or interpretation at any time while this Agreement is in effect that prohibits, restricts, limits or in any way materially adversely changes or affects any party's rights or obligations hereunder, the affected party may give the other party notice of intent to amend this Agreement to the satisfaction of the affected party, in order to compensate for such prohibition, restriction, limitation or material adverse change. If the parties do not or cannot mutually agree to amend this Agreement in writing within thirty (30) days after such notice is given, then either party may elect to immediately terminate this Agreement.

Section 6.4 **Effects of Termination.** (a) Following any notice of termination of this Agreement, whether given by MPA or Physician, the parties shall fully cooperate with each other on all matters relating to the completion of Physician's pending work under this Agreement. Physician specifically covenants that Physician will use Physician's best efforts to effect an orderly transition in the event of termination. MPA shall continue to be entitled to the services of Physician and Physician shall continue to be entitled to compensation and benefits from MPA during this period as provided herein.

(b) Upon termination of this Agreement, neither party shall have any further obligation hereunder, except for obligations accruing prior to the date of termination and those obligations contained herein which are expressly made to extend beyond the term of this Agreement. Notwithstanding the foregoing, Physician shall be required to repay any negative Profit Center Balance (deficit) at the time Physician's employment with MPA terminates, as set forth in Exhibit "B".

## ARTICLE VII
## NOTICES

All notices required or permitted to be given under this Agreement shall be in writing and shall be sent certified mail, return receipt requested. All notices shall be deemed to have been given as of the date of the postmark by the Post Office. Postmark by meter machine shall not be recognized as due notice. All notices shall be addressed

to the other party at the following addresses or at such other address as a party may from time to time designate by notice hereunder:

Vice President                                         Sharon Bertroche, M.D.
Mercy Physician Associates, Inc.        MercyCare Marion
600 7th Street S.E.                                3701 Katz Drive
Cedar Rapids, IA 52403                       Marion, IA 52302

## ARTICLE VIII
## ACCESS TO RECORDS REQUIRED BY H.H.S. REGULATION

If and to the extent required by Section 1395x(v)(1) of Title 42 of the United States Code, until the expiration of four years after the termination of this Agreement, the parties shall make available, upon written request to the Secretary of the United States Department of Health and Human Services, or upon request to the Comptroller General of the United States General Accounting Office, or any of their duly authorized representatives, a copy of this Agreement and such books, documents and records of the parties as are necessary to certify the nature and extent of the costs of the services provided by Physician under this Agreement. The parties agree that, in the event they carry out any of their duties under this Agreement through a subcontract with a value or cost of $10,000 or more over a 12-month period with a related organization, such contract shall contain a clause to the effect that, until the expiration of four years after the furnishing of such services pursuant to such subcontract, the related organization shall make available, upon written request to the Secretary of the United States Department of Health and Human Services, or upon request to the Comptroller General of the United States General Accounting Office, or any of their duly authorized representatives, a copy of such subcontract and such books, documents and records of the parties as are necessary to certify the nature and extent of such costs. The parties' obligations hereunder shall extend beyond the term of this Agreement.

## ARTICLE IX
## CONFIDENTIALITY AND PROPERTY

Section 9.1 *Medical Records & Other Protected Health Information.* (a) The medical and billing records of all patients of MPA for which Physician provides Professional Medical Services shall be considered to be the property of MPA or that of one of its affiliated corporations.

(b) The parties agree to comply with the Health Insurance Portability and Accountability Act's Privacy Rule and other federal and state laws concerning the confidentiality of protected health information (as defined therein). Physician shall not disclose such information except as may be required in the course of his/her employment by MPA, as required by law or as otherwise agreed to in writing by MPA. Physician agrees to appropriately resist efforts to obtain unauthorized access to protected health information that may be in MPA's possession.

(c) Subject to applicable law, Physician may photocopy protected health information for the purpose of defending a malpractice claim or audit directly involving Physician, provided that such photocopying shall take place at Physician's own expense during normal office hours.

Section 9.2  **Confidential Business Information.**  Physician agrees to keep confidential and not use or disclose to others during the term of this Agreement and thereafter, except as expressly consented to in writing by MPA or required by law, any secrets or confidential technology, proprietary information, customer lists, marketing analysis or strategies or trade secrets of MPA, or any matter or information ascertained by Physician through Physician's employment with MPA under this Agreement, the use or disclosure of which might reasonably be construed to be contrary to the best interest of MPA or an affiliate of MPA.

Section 9.3  **Intellectual Property.**  Physician agrees that all inventions, discoveries, writings, software, publications and other matters that could be subject to copyright, trademark and/or patent protection (hereinafter "Intellectual Property") belong to MPA if created by Physician during time spent fulfilling the obligations hereunder or with respect to a patient or patients of the Clinic.  Notwithstanding the foregoing, such Intellectual Property shall belong to Physician if created by Physician during activities approved by MPA in which Physician retains the revenue therefrom pursuant to §4.4(c) herein.

Section 9.4  **MPA Property.**  Physician agrees that, upon termination of this Agreement or any extension thereof, Physician will neither take nor retain, without prior written authorization from MPA, any papers, patient lists, fee books, patient records, files or other documents or copies thereof or other confidential information or property of any kind belonging to MPA or an affiliate of MPA.

## ARTICLE X
## RISK MANAGEMENT

MPA agrees that professional negligence allegedly committed by Physician in the course of Physician's employment with MPA will be covered under MPA's professional liability insurance policy, subject to the extent of such policy limits. Physician and MPA agree that any unlawful intentional acts committed by either Physician or MPA will be the sole responsibility of the party committing them.  Physician and MPA agree that liability for any acts or omissions of Physician that are not covered by MPA's professional liability insurance policy will be the sole responsibility of Physician.

## ARTICLE XI
## MISCELLANEOUS

The parties' obligations hereunder shall extend beyond the term of this Agreement:

Section 11.1 ***Applicable Law.*** This Agreement shall be construed, and all of the rights, powers and liabilities of the parties hereunder shall be determined, in accordance with the laws of the State of Iowa. The parties waive trial by jury and consent to and confer personal jurisdiction on courts of the State of Iowa or of the Federal Government and agree that any lawsuit arising out of this Agreement shall be brought in a court of competent jurisdiction within Linn County, Iowa. Each party submits to the jurisdiction of such courts, expressly waives any objections as to jurisdiction and venue of such courts and agrees that this choice of law and forum provision is fair and reasonable.

Section 11.2 ***Amendments to Law.*** The parties recognize that this Agreement at all times is to be subject to applicable state, local, and federal law and that the Agreement shall be subject to amendments in such laws and regulations and to new legislation.

Section 11.3 ***Law Supersedes Agreement.*** Any provisions of law that invalidate, or otherwise are inconsistent with, the terms of this Agreement or that would cause one or both of the parties to be in violation of law, shall be deemed to have superseded the terms of this Agreement.

Section 11.4 ***Severability.*** If any provision or clause of this Agreement or application thereof to any person or circumstances is held invalid or unlawful, such invalidity or unlawfulness shall not affect any other provision or clause of this Agreement or application thereof which can be given effect without the invalid or unlawful provision, clause or application.

Section 11.5 ***Remedies.*** No remedy herein conferred upon or reserved to either party is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity. Every power and remedy given by this Agreement to MPA or Physician may be exercised from time to time and as often as may be deemed expedient by the parties.

Section 11.6 ***Waiver.*** No delay or omission of MPA or Physician to exercise any right or power accruing upon any event of default shall impair any such right or power, or shall be construed to be a waiver of any such event or default or an acquiescence therein. Furthermore, any such delay or omission by either party in relation to a breach of any provision of this Agreement by the other shall not be construed as a waiver of any subsequent breach.

Section 11.7 **Assignment.** All rights and obligations under this Agreement shall be personal to each party and shall not be assigned or otherwise disposed of by either party without prior written approval of the other party, except that MPA may assign this Agreement to another of its affiliates without Physician's consent. Subject to the foregoing limitation upon assignment, the rights and obligations under this Agreement shall inure to the benefit of and be binding upon the parties hereto and upon their heirs, executors, administrators, successors and assigns.

Section 11.8 **No Third Party Beneficiaries.** Nothing express or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assigns of the parties, any rights, remedies, obligations or liabilities whatsoever.

Section 11.9 **No Construction Against Drafting Party.** The parties acknowledge that each of them and their counsel have had an opportunity to review this Agreement and that this Agreement will not be construed against MPA merely because MPA has prepared it.

Section 11.10 **Additional Terms and Conditions.** Any additional terms and conditions of this Agreement shall be set forth in an Addendum attached hereto and by this reference incorporated herein.

Section 11.11 **Entire Agreement.** This Agreement and all Exhibits and Addendums attached hereto and incorporated herein contain the entire understanding between the parties.

Section 11.12 **Amendments.** This Agreement may not be amended or supplemented at any time unless by a writing executed by the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first below written.

**MPA:**

Tim Charles, Vice President                    Date 5/15/04

**PHYSICIAN:**

Sharon Bertroche, M.D.                    Date 5/10/06

## EXHIBIT "A"

## PRIMARY CARE PHYSICIAN'S DUTIES

Physician is required to perform the following duties (with or without reasonable accommodation for any known disability), which constitute the essential functions of Physician's employment with MPA, at the Clinic identified in §4.1; provided, however, that Physician may be assigned to another MercyCare clinic subject to Physician's consent, which consent shall not be unreasonably withheld; and further provided that these duties may be unilaterally amended by MPA to adapt to changing practice needs, as long as Physician retains comparable duties and responsibilities:

A.  Scheduling duties:

   1.  Scheduling Physician's own office hours, call coverage and hospital and nursing home rounds, subject to MPA approval;

   2.  Notifying Physician's answering service, MPA administration and Mercy Trauma Center of Physician's call schedule (including any changes thereto);

   3.  Notifying MPA administration as soon as reasonably possible in advance of Physician's time off, whether such time off is scheduled or unscheduled, for paid or unpaid leave, or for CME;

   4.  Obtaining qualified coverage for Physician's time off, subject to MPA approval; and

   5.  Providing occasional coverage for other MPA physicians who are taking time off.

   6.  Submitting a plan for coverage if the Physician does not schedule hospital and nursing home rounds as required in paragraph A(1) of this Exhibit. The coverage plan must be submitted to and approved by the MPA Board of Directors prior to implementation of the coverage plan. In the event the coverage plan changes, the plan is required to be resubmitted to the MPA Board of Directors for approval.

B.  Professional Medical Services duties:

   1.  Providing Professional Medical Services to MPA patients during Physician's office hours, call coverage, hospital and nursing home admissions and hospital and nursing home rounds.

      a.  "Professional Medical Services" shall mean the provision of medical services to patients within the scope of Physician's license in strict

conformity with recognized standards of care in a competent and professional manner and in a manner consistent with the Principles of Medical Ethics of the American Medical Association.

b.   "Call coverage" includes the provision of Professional Medical Services while designated as being "on call" for responding to telephone calls from MPA patients during and outside of scheduled office hours, seeing scheduled and unscheduled MPA patients in the office during office hours, responding to emergency room physician requests to treat MPA patients in the emergency room, and responding to hospital nurse requests to see MPA patients in the hospital.

c.   "Hospital and nursing home admissions" includes the provision of Professional Medical Services while admitting MPA patients to hospitals and nursing homes.

d.   "Hospital and nursing home rounds" includes the provision of Professional Medical Services while visiting MPA patients who have already been admitted to a hospital or are residents of a nursing home.

2.   As part of the provision of Professional Medical Services, Physician is expected to perform the following duties:

a.   Submitting a plan for coverage if the Physician is not able to perform hospital and nursing home rounds and admissions as required pursuant to paragraphs A(1) and B(1) of this Exhibit. The coverage plan must be submitted to and approved by the MPA Board of Directors prior to implementation of the coverage plan. In the event the coverage plan changes, the plan is required to be resubmitted to the MPA Board of Directors for approval;

b.   Obtaining and recording an appropriate medical history of each patient, including, but not limited to, the patient's chief complaint, a review of systems, the patient's past medical history and the patient's family history;

c.   Performing and documenting a clinically appropriate physical examination of each patient;

d.   Performing and/or ordering clinically appropriate procedures for each patient and documenting same;

e.   Analyzing reports and findings of tests and clinical examinations in order to assess the medical condition of each patient, including

formulating a diagnosis of the injury or illness and documenting same in conformity with applicable professional standards, third party payor requirements and MPA policies and procedures;

f. Prescribing clinically appropriate medication and treatment for each patient and recommending appropriate physical and dietary routines, methods for prevention of disease and personal hygiene measures and documenting same;

g. Referring each patient to other physicians, including specialists and other health care providers, whenever the patient's condition so warrants and documenting same;

h. Keeping and maintaining accurate, complete, appropriate, timely and legible medical records relating to all professional services rendered to MPA patients in conformity with applicable professional standards, third party payor requirements and MPA policies and procedures;

i. Timely reporting births, deaths, outbreaks of contagious disease and other information required by law to be reported to governmental authorities; and

j. Complying with all risk management recommendations made to Physician by MPA or its insurer.

C. Behavioral duties:

1. Following established procedures, policies and processes to resolve problems

a. Complying with MPA policies and processes

b. Adhering to Quality Council policies and processes

c. Adhering to Quality Steering Committee policies and processes

d. Working to resolve all issues within the MPA governance structure (working through established channels and processes)

e. Treating and communicating with patients in a timely and professional manner

f. Complying with and abiding by Transaction Review Committee recommendations

EXHIBIT B

g.     Completing medical record documentation and billing entries in a timely and appropriate fashion

h.     Completing charge documentation for all services performed in a timely and appropriate fashion

2.     Actively Participating in MPA Governance

    a.     Providing positive leadership to Physician Assistant's Care Delivery Team--set a positive tone

    b.     Developing and maintaining a Team Action Plan

    c.     Conducting monthly Care Delivery Team meetings

    d.     Regularly attending and participating in monthly Quality Council meetings

    e.     Assisting in the development and maintenance of a Quality Council Action Plan

    f.     Agreeing to abide by and comply with recommendations and decisions of the site Quality Council, Quality Steering Committee and the MPA Board of Directors

3.     Maintaining a Positive Attitude

    a.     Refraining from any public criticism of:
      • MPA, Mercy Medical Center or any of their affiliates as an organization
      •administrators or managers of MPA, Mercy Medical Center or any affiliates
      •the MPA Team Bonus System or Physician Employment Contract

    b.     Participating in meetings in a positive manner

    c.     Treating nurses and ancillary staff with courtesy and dignity

    d.     Arriving on time for scheduled appointments with patients and for scheduled meetings

D.     Related duties:

1.     Following all applicable MPA policies, the MercyCare Service Corporation compliance plan, all applicable federal, state and local laws and rules of professional conduct for physicians, including MPA's policy that patients in

need of diagnosis and care be treated in a nondiscriminatory manner without regard to race, creed, color, sex, religion, national origin, or disability; provided, however, that to the extent that any of MPA's policies shall conflict with any provision of this Agreement, the terms of this Agreement shall supersede said policies;

2.    Providing technical supervision of non-physician clinical personnel, i.e. physician extenders, nurses, etc., in accordance with applicable law;

3.    Preparing and attending, in a timely fashion, to all reports, claims, and correspondence necessary or appropriate to the performance of the Professional Medical Services, including coding Professional Medical Services rendered to accurately describe the service ordered and performed for reimbursement purposes in accordance with applicable law;

4.    Meeting and maintaining eligibility, within standards established by MPA's professional liability insurance carrier, to be included as a covered employee under MPA's professional liability insurance policy;

5.    Seeking and maintaining qualification to provide services that constitute covered services under plans sponsored by preferred provider organizations, health maintenance organizations, physician hospital organizations, accountable health plans and similar organizations as designated by MPA;

6.    Participating in all managed care contracts applicable to the Clinic involving primary care services to which MPA is a party, including participation in the quality assessment and improvement, utilization review, and other similar programs of the managed care contractors and MPA associated therewith (Note that Physician is prohibited from entering into a third party contract without the express written consent of MPA's Board of Directors);

7.    Meeting the conditions of participation for the Medicare and Medicaid programs;

8.    Procuring all required provider numbers as appropriate and not acting or failing to act in such a way that will adversely affect third party reimbursement or provider status;

9.    Exercising diligence in assisting MPA in keeping controllable costs of the Clinic to a minimum and performing all obligations under this Agreement in accordance with the Clinic budget;

10.    Notifying MPA as soon as reasonably possible whenever Physician discovers that the office space, furniture or equipment is in need of repair,

defective, dangerous, or being misused by office personnel and requisitioning repair and other support services for same;

11. Immediately notifying MPA's compliance officer of any practices of MPA or actions of MPA's employees that Physician believes may not comply with state and/or federal laws;

12. Attending professional conventions and seminars and participating in professional societies on a reasonable basis; and

13. Performing other duties assigned by MPA from time to time that are commensurate with professional services normally and customarily performed by a primary care physician, such as participating in MPA governance, credentialing, peer review, utilization review and/or risk management activities, providing educational programs for both health care providers and lay members of the community, promoting the professional practice of the primary care network and assisting in the recruitment of new MPA practitioners.

## EXHIBIT "B"

## COMPENSATION PROGRAM
## FOR PRIMARY CARE PHYSICIANS

### I. OBJECTIVES

The MPA Compensation Program for primary care physicians is intended to accomplish several objectives:

- Provide a strong incentive to join and remain with MPA;
- Provide fair and stable compensation;
- Maintain a reasonable relationship between earnings and level of effort;
- Reward good case management and avoid incentives for ordering ancillaries and referring;
- Provide an incentive to maintain or increase productivity;
- Provide incentives to deliver quality health care services; and
- Provide incentives to serve the elderly, indigent and nursing home populations consistent with community service and system values.

### II. SALARY/DRAW

    A.    NEW MPA PHYSICIANS

The provisions in part A apply only if Physician has not been employed by MPA in the year prior to signing this Agreement.

        1.    First Contractual Year--Minimum Guaranteed Salary

The amount paid to Physician for the first contractual year shall be $120,000 or the amount that Physician would have earned under the Team Bonus System, whichever is greater.

        2.    Subsequent Contractual Years--Team Bonus System

Following the first contractual year, Physician shall receive compensation based entirely on the Team Bonus System described below. The compensation paid in the second contractual year will also be subject to the New Practice Safety Net.

Prior to the commencement of the second contractual year and each contractual year thereafter, MPA and Physician shall mutually determine the amount of Physician's anticipated annual compensation for the next contractual year based upon Physician's performance the preceding year and any foreseeable changes to Physician's practice. This amount shall be used to establish a "draw" amount, which will be paid to Physician in equal installments every two weeks.

### 3.    New Practice Safety Net

"New Practice Safety Net" refers to support given to new physicians during their second year of employment with MPA.

During the second contractual year, Physician's Profit Center will be credited up to $30,000 ($7,500 per quarter or $2,500 per month) as needed to bring Physician's compensation up to $120,000 per year.

### B.    CURRENT MPA PHYSICIANS

The provisions in part B apply only if Physician has been employed by MPA in the year prior to signing this Agreement.

Physician's compensation shall be entirely based upon the Team Bonus System. The Team Bonus System rewards productivity, quality care and community service.

Prior to the commencement of each contractual year, MPA and Physician will mutually determine the amount of Physician's anticipated annual compensation for the next contractual year based upon Physician's performance the preceding year and any foreseeable changes to Physician's practice.  This amount shall be used to establish a "draw" amount, which will be paid to Physician in equal installments every two weeks. Physician's draw amount for the first contractual year shall be $158,080.

Reconciliation between Physician's draw amount and the amount actually earned under the Team Bonus System will occur on a quarterly basis, as set forth below.

## III.    TEAM BONUS SYSTEM

### A.    DETERMINING PROFIT CENTER BALANCE

Under the Team Bonus System, Physician's compensation is determined by the financial viability of Physician's own practice, referred to as Physician's "Profit Center".  The net surplus or deficit at any given time in Physician's Profit Center is referred to as Physician's "Profit Center Balance".

### 1.    Values used in calculating Profit Center Balance

On a quarterly basis, MPA shall determine the following values based upon data from the preceding quarter:

#### a.    Net Practice Revenue

"Net Practice Revenue" refers to all income received by Physician from patients and third-party payors, including capitation fees, less refunds and returned checks, from the

EXHIBIT B

provision of Professional Medical Services, Administrative Services and Other Professional Activities hereunder. In addition, "Net Practice Revenue" refers to all interest income and payments to Physician received from sources other than patients and third-party payors, such as income from interpretation of EKG's, teaching, research, grants, stipends, administrative fees, etc., although it does *not* include payments to Physician for activities under §3.4 and §4.4 of this Agreement in relation to which MPA has determined in advance that the income shall go to Physician.

> b. Non-Practice Revenue

"Non-Practice Revenue" is the sum of the amounts earned in the following two categories and is paid at the discretion of the MPA Board of Directors. The MPA Board of Directors may on an annual basis set a non-practice revenue budget that may be available to be paid to all eligible physicians, physician assistants and nurse practitioners. As a result of this determination non-practice revenue may be paid in any year based upon the criteria listed below. The MPA Board of Directors reserves the right to make adjustments to the criteria and the amount of non-practice revenue that is being paid to ensure that the paid non-practice revenue does not exceed the non-practice revenue budget.

> 1) Quality Indicators and
> 2) Community Service and System Values.

"Quality Indicators" are those duties performed by Physician that promote leadership, quality and compliance as more fully defined in Exhibit "D" of the Agreement. Physician's Profit Center may be credited for performing such duties as follows:

| | |
|---|---|
| Attending Care Delivery Team meetings | $250 each month |
| Attending Quality Council and Group Action Plan meetings | $250 each month |
| Developing & reviewing individual Quality Improvement Plan | $250 each month |
| Achieving a patient satisfaction level within ICQC norms | $250 per quarter |
| Participating in practice benchmarking | $1,000 annually |
| Providing peer feedback and review | $500 per quarter |
| Attending Quality Steering Committee meetings | $250 per quarter |

"Community Service and System Values" are those duties performed by Physician that promote community service and foster system values, such as serving the elderly and indigent patient populations, as more fully defined in Exhibit "D" of the Agreement. Under current reimbursement schemes, there is a disincentive for doctors to serve these populations, because Medicare and Medicaid, which cover these populations, do not pay as much as other third party payors for the same services. To offset this disincentive, Physician's Profit Center may be credited a set dollar-per-RVU amount for exceeding the target for Medicare/Medicaid population, serving the indigent population and exceeding the target for Medicare/Medicaid nursing home population. These targets and the set dollar-per-RVU amount for each duty shall be determined by MPA on an annual basis.

c. Itemized Expenses

"Itemized Expenses" are the following direct practice expenses (which are further defined in the *Team Bonus System Terms of Reference* handout attached hereto as Exhibit "D" and by this reference incorporated herein) incurred by Physician in relation to the provision of Professional Medical Services, Administrative Services and Other Professional Activities hereunder and approved by Physician, the MPA Quality Steering Committee or the MPA Board:

1. Clinical staff salaries and benefits*
2. Non-clinical staff salaries and benefits
3. Central services salaries and benefits
4. Staff quality rewards
5. Office space/rent/occupancy costs
6. Clinical supplies
7. Office supplies
8. Malpractice insurance
9. Accounting fees
10. Management fees
11. CBO billing
12. Transcription
13. Depreciation
14. Physician support services
15. Electronic data processing services
16. Staff recruiting fees
17. Advertising
18. Computer services
19. Miscellaneous expenses

*Note that "Clinical staff salaries and benefits" includes the cost of Physician's draw and benefits, which is the actual expense of the draw and benefits distributed to Physician or on Physician's behalf during the quarter being reconciled.

d. New Practice Safety Net Amount

As set forth above, if Physician is a new MPA physician in his/her second year of practice, MPA will credit Physician's Profit Center by an amount up to $30,000 ($7,500 per quarter or $2,500 per month) as needed to bring Physician's compensation up to $120,000 per year.

2. Calculating Profit Center Balance

After each of the foregoing values are determined, MPA shall calculate the Profit Center Balance according to the following formula:

> Net Practice Revenue plus Non-Practice Revenue, minus Itemized Expenses*, plus New Practice Safety Net Amount (if applicable) = Profit Center Balance

*Note that the actual cost of Physician's draw and benefits is being deducted from Physician's Net Practice Revenue as an Itemized Expense, thereby reducing the Profit Center Balance.

  B.    PHYSICIAN'S SHARE OF TEAM BONUS

    1.    Positive Profit Center Balance (Surplus)

If the Profit Center Balance is a positive number (reflecting a surplus), Physician shall receive forty-five percent (45%) of the positive Profit Center Balance as Physician's share of the Team Bonus, subject to the provisions governing Physician's Reserve Fund set forth below.

> For example, if Physician is in the second year of practice with MPA and has Net Practice Revenue of $75,000 during the third quarter, with Itemized Expenses of $85,000 for that quarter, and Non-Practice Revenue of $12,500 for that quarter, plus $7,500 Safety Net Amount for that quarter, the Profit Center Balance for that quarter will be:
>
> |  | $75,000 | Net Practice Revenue |
> |---|---|---|
> | - | $85,000 | Itemized Expenses |
> |  | [$10,000] |  |
> | + | $12,500 | Non-Practice Revenue |
> |  | $ 2,500 |  |
> | + | $ 7,500 | New Practice Safety Net Amount |
> |  | $10,000 | Profit Center Balance |
>
> Physician will then receive 45% of the positive Profit Center Balance ($4,500) as Physician's share of the Team Bonus, subject to the Reserve Fund requirements.

    2.    Negative Profit Center Balance (Deficit)

In the event Physician's Profit Center Balance is a negative number (reflecting a deficit), funds will be withdrawn from Physician's Reserve Fund to balance the deficit. If there are no funds in the Reserve Fund or the funds in the Reserve Fund are insufficient to fully cover the deficit, Physician's Draw and Benefits will automatically be reduced to an amount to be determined by the MPA Board. Subsequent reviews will be held on a monthly, rather than quarterly, basis until Physician's Profit Center Balance is a positive number (reflecting a surplus), at which time quarterly reviews and the full amount of Physician's Draw and Benefits will resume. All amounts withdrawn from Physician's Reserve Fund must be repaid from the surplus in future months before Physician will receive a share of the Team Bonus again. Upon termination of Physician's employment

with MPA, Physician shall be required to repay the deficit within thirty (30) days of Physician's last day of work.

        3.    Physician's Reserve Fund

A minimum of one thousand five hundred dollars ($1,500) per quarter will be withheld from Physician's share of the Team Bonus and placed in Physician's Reserve Fund until such Reserve Fund reaches the threshold level set forth below, with the money to be invested in a liquid market value account at MPA's direction and all interest to accrue to the Reserve Fund. The remainder of Physician's share of the Team Bonus will be distributed directly to Physician.

The threshold level for Physician's Reserve Fund shall be $36,000. Once this level is reached, no further amounts will be withheld from Physician's share of the Team Bonus, unless the Fund drops below the threshold level. The threshold level may be revised from time to time by MPA's Board of Directors.

> For example, if, during the quarterly review, it is determined that the Profit Center Balance is $10,000, Physician shall receive 45% of this amount, or $4,500. Of this $4,500, Physician will have $1,500 withheld and placed into Physician's Reserve Fund if Physician has not already met the threshold amount and Physician will receive a check for $3,000.

Once Physician's Reserve Fund has reached the threshold level, Physician shall be eligible to access this money for purposes related to Physician's employment with MPA, subject to approval by MPA's Board of Directors. For example, Physician may wish to purchase certain equipment, software, etc. that have not been included in the MPA budget or previously approved by MPA's Board of Directors. All amounts withdrawn from Physician's Reserve Fund for this purpose must be repaid through quarterly withholds as set forth above and no further withdrawals by Physician will be allowed until the threshold level is once again met.

Upon termination of Physician's employment, Physician shall receive the entire amount of Physician's Reserve Fund, including all interest and dividends paid thereon.

        C.    REMAINDER OF TEAM BONUS

The remainder of the Team Bonus (fifty-five percent (55%) of a positive Profit Center Balance) shall be distributed as follows:

    30% for staff bonus
        *26% to Care Delivery Team
        *3% to Clinic Staff
        *1% to Quality Improvement Coordinator
    <u>25%</u> to Mercy Physician Services, Inc.
    55%

EXHIBIT B

For example, if the Profit Center Balance is $10,000, Physician shall receive 45% of this amount, or $4,500 (subject to Reserve Fund requirements), the Staff will receive 30% of this amount, or $3,000, and MPSI will receive 25% of this amount or $2,500.

## IV. SUPERVISING PA'S/NP'S

### A. PA'S/NP'S WHO OPERATE OWN PROFIT CENTERS

In the event Physician shall supervise one or more Physician Assistants (PA's) and/or Nurse Practitioners (NP's) who operate their own profit centers, all revenue collected from services provided by the PA's/NP's shall be considered part of the PA's/NP's own profit centers and the salary and benefits paid to the PA's/NP's shall not be considered an Itemized Expense in calculating Physician's Profit Center Balance. If the PA's/NP's have a positive Profit Center Balance in their own profit centers, Physician shall receive a pre-determined percentage of each PA's/NP's positive Profit Center Balance. This amount shall be based upon the fair market value for such services determined jointly by MPA, Physician and the PA's/NP's being supervised on an annual basis and whenever a change in supervision occurs.

### B. PA'S/NP'S WHO DO NOT OPERATE OWN PROFIT CENTERS

In the event Physician shall supervise one or more Physician Assistants (PA's) and/or Nurse Practitioners (NP's) who do not operate their own profit centers, all revenue collected from services provided by the PA's/NP's shall be considered part of Physician's Net Practice Revenue and the salary and benefits paid to the PA's/NP's shall be considered an Itemized Expense in calculating Physician's Profit Center Balance. If there is a positive Profit Center Balance, Physician shall split his/her 45% share of the Team Bonus with the PA's/NP's being supervised, which amount shall be considered a bonus to the PA's/NP's. The formula for determining the exact amount to be distributed to the PA's/NP's as a bonus will be based upon fair market value for such services determined jointly by MPA, Physician and the PA's/NP's being supervised on an annual basis and whenever a change in supervision occurs.

## V. BENEFITS

Physician shall be immediately entitled to receive the following benefits, unless a waiting period is specified herein. The plan document controls the eligibility for and payment of benefits over any statement in this Agreement. The cost of all of these benefits is deducted from Physician's Net Practice Revenue as an Itemized Expense, thereby reducing Physician's Profit Center Balance.

### A. HEALTH INSURANCE

If Physician is not yet eligible for Medicare, MPA offers single or family health insurance coverage via a group health plan. Physician should refer to the plan document and Summary Plan Description, which are subject to amendment, for details regarding any

deductible and co-pay responsibilities, out of pocket maximums and coverage limitations.

If Physician is eligible for Medicare, MPA anticipates that Medicare will be considered primary. An individual Medicare Supplement Policy is provided under Plan J at Physician's expense. Physician should refer to the plan document and Summary Plan Description, which are subject to amendment, for details regarding any deductible and co-pay responsibilities, out of pocket maximums and coverage limitations. Physician may continue this policy at Physician's expense after retirement. If an individual policy already exists, MPA will pay all but Physician's share of the premium.

MPA also provides single or family dental insurance coverage. Physician should refer to the plan document and Summary Plan Description, which are subject to amendment, for details regarding any deductible and co-pay responsibilities, out of pocket maximums and coverage limitations.

Coverage offered under the MPA medical and dental insurance plans can be pre-tax via a Section 125 plan to the extent allowed by non-discrimination regulations and the provisions of the plan document.

As an alternative, Physician can continue existing medical and/or dental insurance coverage and receive reimbursement for the insurance up to the cost of the MPA-sponsored plan. Any reimbursement will be taxable to the Physician.

B. TERM LIFE INSURANCE

Physician will receive Life Insurance benefits. Life insurance benefits will be as follows:

| Under Age 65 | $100,000 plus Accidental Death Benefits |
| Age 65-69 | $65,000 |
| Age 70-74 | $45,000 |
| Age 75+ | $30,000 |

Coverage in excess of $50,000 creates taxable income according to current IRS regulations.

C. DISABILITY INCOME INSURANCE

The plan provides Disability Income after a 180-day elimination period. Each month, 60% of base income up to a maximum of $7,500 is paid to Age 65. Thereafter, the length of benefits is determined by the age at disability, as shown below:

| Age 66 | 24 months |
| Age 67 | 18 months |
| Age 68 | 15 months |
| Age 69+ | 12 months |

The policy uses Physician's own occupation as a determination of disability. If Physician is partially disabled, the plan pays a proportional benefit. Increases in benefits are made for increases in the Consumer Price Index. Pre-existing conditions are covered after twelve months of continuous coverage. The plan document and Summary Plan Description provide a more complete description of benefits.

### D. NON-QUALIFIED DEFERRED COMPENSATION

Physician may choose to participate in MPA's non-qualified deferred compensation plan, which is subject to amendment. A copy of the plan has been provided to Physician. Accumulations are tax-deferred, within MPA's nonqualified deferred compensation plan, subject to eligibility. An "ELECTION TO PARTICIPATE IN DEFERRED COMPENSATION PLAN AND DESIGNATION OF BENEFICIARY" form is attached hereto as Exhibit "C" and this document must be completed and signed prior to participation in the plan.

### E. QUALIFIED DEFERRED COMPENSATION -- 401(k) PLAN

Physician may participate in MPA's 401(k) plan, which is subject to amendment. The terms of the plan govern eligibility, participation and benefits. A copy of the Summary Plan Description has been provided to Physician.

### F. MALPRACTICE INSURANCE

MPA will provide claims-based professional liability insurance coverage in the minimum amount of $1,000,000 per occurrence and $3,000,000 annual aggregate to cover claims of Physician's negligent acts or omissions occurring in the course of performing Physician's duties under the Employment Agreement. However, if Physician provides obstetrical services as part of Physician's duties hereunder, or if Physician desires higher limits, MPA shall provide such insurance in the amount of $2,000,000 per occurrence and $4,000,000 annual aggregate, instead.

MPA will also provide a reporting endorsement, known as "tail coverage", to cover such claims made after termination of Physician's employment with MPA if Physician completes the initial five (5) year term of this Agreement, or if not completed by Physician, the reason for such failure to complete the initial five (5) year term is due to Physician's death or disability or due to MPA's decision to cease to do business.

In the event MPA does not provide tail coverage , Physician agrees to provide his/her own tail coverage to cover claims made against Physician after termination of Physician's employment with MPA. This provision shall survive termination of this Agreement.

### G. PAYROLL TAXES

The employer's share of FICA and Medicare (OASDI/HI) is paid by MPA at the current applicable rates. The Non-Qualified Deferred Compensation Plan (see paragraph D, above) provides for an election regarding deferred compensation taxation.

H.    WORKERS' COMPENSATION

MPA will provide worker's compensation coverage for Physician as required by law.

I.    LEAVE, TRAVEL, CME, LICENSES AND DUES

Physician may take a reasonable amount of leave per year for vacations, sick leave, maternity/paternity leave, holidays and personal time. However, Physician understands and acknowledges that, while on leave, Physician will not be earning Net Practice Revenue from the provision of Professional Medical Services, Administrative Services and Other Professional Activities by Physician, but is still responsible for the cost of Itemized Expenses, which may result in a negative Profit Center Balance (deficit). More than 28 days per year of leave requires MPA Board approval.

Travel expenses for the performance of job duties are reimbursed at the IRS rate.

A reasonable amount of time per year and reasonable expenses are allowed for Continuing Medical Education.

MPA will reimburse the cost of renewing Physician's license to practice medicine in Iowa, DEA registration, professional medical association dues and costs of examination for board certification.

J.    EMPLOYEE ASSISTANCE PROGRAM

The Mercy Employee Assistance Program is available to Physician and Physician's dependents.

**Physician waives his/her rights to any other MPA employee benefits that may be offered to other MPA employees and acknowledges that he/she is ineligible to participate in any such other plans or programs unless specifically provided for in the governing plan document.**

## EXHIBIT "C"

## ELECTION TO PARTICIPATE IN DEFERRED COMPENSATION PLAN
## AND DESIGNATION OF BENEFICIARY

Pursuant to the attached Deferred Compensation Agreement, I hereby elect to defer, as provided in the Plan, the receipt of $_____ of the annual compensation earned by me in connection with the performance of my services for Mercy Physician Associates, Inc. beginning the ____ day of _____, _____.

Deferred amounts shall be taxed for OASDI/HI purposes only once. I realize that the decision regarding the timing of reporting OASDI/HI taxes on the deferred compensation is unique to each individual and that I should consult my own tax adviser before making this election. With that in mind, I hereby elect to have OASDI/HI taxes on deferred compensation computed according to the following rule: (CHECK ONE)

____ General rule (deferred amounts reported as income in the calendar year in which they are paid).

____ Special timing rule (deferred amounts reported as income in the calendar year in which they are deferred).

I hereby designate _____ as my beneficiary or beneficiaries to receive all amounts held for me under the Plan that have not been paid to me at the date of my death, and if my spouse is not my beneficiary, then he/she has consented to such beneficiary designation by affixing his/her signature hereto.


_____       _____
Physician                       Date


_____       _____
Spouse                          Date


_____       _____
Witness                         Date

**EXHIBIT "D"**
**TEAM BONUS SYSTEM TERMS OF REFERENCE**

I.   **SUMMARY OF CONTENTS**

Revenue
- Expected Receipts
- Other Income

Itemized Expenses
- Clinical Staff Salaries
- Non-Clinical Staff Salaries
- Central Services Salaries
- Transcription Salaries
- Resource Staff Salaries
- Benefits
- Staff Quality Rewards
- Office Space/Rent/Occupancy Costs
- Clinical Supplies
- Office Supplies
- Malpractice Insurance
- Accounting Fees
- Management Fees
- CBO Billing
- Transcription
- Depreciation
- All Other Expenses

Provider Compensation
- Provider Salaries
- Provider Quality Rewards
- Quality Reward Reserve
- Provider Benefits
- CME Meetings and Travel
- Dues and Subscriptions

Non-Practice Revenue
- System Value Support
- New Practice Safety Net
- System Recapitalization
- Other Non-Practice Revenue

II.  **REVENUE**

A.   **Expected Receipts**
1.   All income received from patients and third party payers
2.   Includes capitation fees, less refunds and returned checks
3.   Expected receipts is an estimated number, and is calculated using the gross receipts for the month (x) the rolling 12 month collection percentage

B.  **Other Income**
1.  Interest income and any other income received from sources other than patients and third party payers
2.  Income from interpretation of EKG's, teaching, research, grants, stipends, administrative fees, legal, expense sharing

III.  **ITEMIZED EXPENSES**

A.  **Clinical Staff Salaries**
1.  Includes regular salaries, overtime and paid leave for all clinical staff
2.  Also include the matching FICA tax, unemployment taxes or other payroll taxes on salaries and wages of this group of employees, etc.
3.  Exclude salaries and payroll taxes for doctors, physician's assistants, and nurse practitioners

B.  **Non-Clinical Staff Salaries and Benefits**
1.  Includes salaries for all non-clinical staff
2.  Also include the matching FICA tax, unemployment taxes or other payroll taxes on salaries and wages of this group of employees, etc.

C.  **Central Services Salaries**
1.  Includes salaries for all shared resource staff for the practice (i.e. QIC, greeter, file clerk, etc.)
2.  Also include the matching FICA tax, unemployment taxes or other payroll taxes on salaries and wages of this group of employees, etc.

D.  **Transcription Salaries**
1.  Includes salaries for all MPS employed transcription staff
2.  Also includes the matching FICA tax, unemployment taxes and other payroll taxes on salaries and wages of this group of employees, etc.

E.  **Resource Staff Salaries**
1.  Includes salaries for all Resource staff
2.  Also include the matching FICA tax, unemployment taxes or other payroll taxes on salaries and wages of this group of employees, etc.

F. **Benefits**
1. Includes the cost of health, life and disability insurance, medical expense reimbursement plans, childcare benefits, cafeteria plans, etc., paid on behalf of the staff

G. **Staff Quality Rewards**
1. Team Bonuses paid to staff

H. **Office Space/Rent/Occupancy Costs**
1. All payments for use of space including rent, utilities, office maintenance and telephone expenses

I. **Clinical Supplies**
1. Drugs and other consumables
2. Do not include fees paid to outside laboratories

J. **Office Supplies**
1. All expenses for paper, pencils, computer supplies, postage, forms, etc. for administrative use

K. **Malpractice Insurance**
1. Self-explanatory

L. **Accounting Fees**
1. Annual and Monthly financial reports
2. Payment of all accounts payable
3. Processing of regular staff and provider payroll
4. Periodic tax reports
5. Benefit administration

M. **Management Fees**
1. Allocation of central administration fees
2. Human Resource support
3. Legal fees
4. Benefit administration and pension plan fees
5. Coding and documentation support and audits
6. New employee orientation and training
7. Periodic in-services
8. Annual employee events:
    a. Annual employee chili cook-off or other similar event
    b. Annual summer picnic
    c. Annual fall employee appreciation day
    d. Annual Christmas reception
    e. Annual employee Christmas gifts
    f. Annual employee recognition days

EXHIBIT B

N.  **CBO Billing**
  1.  Insurance claims processing
  2.  Insurance claim follow up
  3.  Bad debt management

O.  **Transcription**
  1.  These are actual costs of transcription for each provider, if a transcriptionist not directly employed by MPS provides the service

P.  **Depreciation**
  1.  Deduction taken for business property
  2.  This figure indicates anything specifically purchased for the provider

Q.  **All other expenses**
  1.  Provider Support Services
    ▪  Answering services
    ▪  Uniforms and laundry service
    ●  Janitorial service
  2.  EDP Service
    ▪  Electronic data processing
    ▪  Electronic claims clearinghouse
  3.  Staff Recruiting Fees
    ●  Costs associated with hiring a new team employee
  4.  Advertising
    ●  Only direct provider marketing is allocated to providers
  5.  Computer services
    ●  Licensure fee for software
    ●  Hardware and software support
    ●  24 hour "help" line, training and computer support
    ●  Periodic software up-grades
  6.  Miscellaneous
    ●  Expenses less than $300 with no specific category

III.  **PROVIDER COMPENSATION**

A.  **Provider Salaries**
  1.  Base salary paid to provider before benefits

B.  **Provider Quality Rewards**
  1.  Team Bonuses paid to providers

**C.** **Quality Reward Reserve**
1. The amount of the physician's portion of the bonus pool that goes into a "savings account", to be used should the physician's profit center show a deficit at the end of any quarter

**D.** **Provider Benefits**
1. Retirement, health insurance, FICA, etc.

**E.** **CME Meetings and Travel**
1. Expenses for CME meetings and travel

**F.** **Dues and Subscriptions**
1. All dues and subscriptions

**IV.** **NON-PRACTICE REVENUE**

**A.** **System Value Support**
1. Quality Indicators – (Leadership, Quality and JCAHO)
   - Care Delivery Team Meeting – System Value Support dollars are paid for the 12 monthly meetings held when the doctor and his/her team meet to discuss quality issues
   - Quality Council and Group Action Plan – System Value Support dollars are paid when the doctor attends monthly Quality Council meetings. At these meetings the physicians discuss quality issues for the practice and review the group's action plan. There are 12 meetings per year.
   - Active Individual Quality Improvement Plan – Each physician has an individual quality improvement plan (Action Plan), which is to be reviewed at each monthly team meeting.
   - Patient Satisfaction – Twice per year each physician practice participates in the collection of patient satisfaction surveys.
   - Practice Benchmarking Participation – Approximately every 18 months each physician participates in a 360-degree review of his/her practice. The results of this review are compared to a national "best practice" database, and are shared with the physician and the practice.
   - Peer Feedback/Citizenship – This review will be done quarterly, and will allow the physician an opportunity to provide feedback to his/her peers. It is an opportunity to foster good citizenship in all the providers.
   - Quality Steering Committee Meetings – One representative from each practice (Chair of the Quality Council) attends quarterly Quality Steering Committee Meetings. The QSC meets to formulate policy regarding issues that are common for all practices.

B.   **New Practice Safety Net**
  1.   Financial support for the new physician, if necessary, for the second year

C.   **System Recapitalization**
  1.   Portion of Team Bonus paid to the MSO for support of the practice

D.   **Other Non-Practice Revenue**
  1.   Rent from tenants and other miscellaneous non-practice revenue

EXHIBIT B

## ADDENDUM TO
## PRIMARY CARE PHYSICIAN EMPLOYMENT AGREEMENT

THIS ADDENDUM is entered into on the day and year set forth below by and between Mercy Physician Associates, Inc., an Iowa corporation (hereinafter "MPA") and Sharon Bertroche, M.D. (hereinafter "Physician").

WHEREAS, a Primary Care Physician Employment Agreement (hereinafter the "Agreement") was executed by the parties to this Addendum on or about May 15, 2006; and

WHEREAS, MPA and Physician are interested in amending that Agreement to update the Employer-Employee provision of the Agreement;

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

Article I, Section 1.1 of the Agreement is hereby deleted in its entirety and replaced with the following:

## ARTICLE I
## EMPLOYER-EMPLOYEE RELATIONSHIP

Section 1.1 **Employment.** Subject to the terms and conditions of this Agreement and approval by Mercycare Service Corporation and its Corporate Compliance Committee, MPA hereby employs Physician, and Physician hereby accepts such employment and agrees to serve MPA as a physician in the primary care setting. It is hereby mutually understood and agreed that Physician is at all times an employee of MPA and not an independent contractor or partner of MPA in performance of Physician's obligations under this Agreement. Physician agrees that he/she is an exempt employee for wage and hour regulations purposes. As of the Employment Start Date, all prior agreements between MPA and Physician regarding Physician's employment with MPA are hereby rescinded and rendered null and void.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum the day and year first below written.

TLM/MERCY/MPA/EmploymentKs/Bertroche-K-Add-K-Overlap-11-20-06

**EXHIBIT B**

MPA:

_____
Tim Charles, Vice President

_____1/23/2007_____
Date

PHYSICIAN:

_____
Sharon Bertroche, M.D.

_____1/15/07_____
Date