**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| SHARON BERTROCHE, M.D; GINA PERRI, M.D.; and ARLEEN ZAHN-HAUSER, M.D., | No. 18-CV-59-CJW-KEM |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| vs. | |
| MERCY PHYSICIAN ASSOCIATES, INC., | |
| Defendant. | |
| MERCY PHYSICIAN ASSOCIATES, INC., | |
| Counter Claimant, | |
| vs. | |
| GINA PERRI, M.D.; and ARLEEN ZAHN-HAUSER, M.D., | |
| Counter Defendants. | |

————————————

**TABLE OF CONTENTS**

I.    PROCEDURAL AND FACTUAL BACKGROUND.................................3

II.   MOTION TO STRIKE ...................................................................8

III.  SUMMARY JUDGMENT STANDARD .............................................9

IV.   SUMMARY JUDGMENT ANALYSIS...............................................11

A.     Equal Pay Act ..............................................................11

     1.    Sex-Based "Wage Rates" ................................................12

     2.    "Equal Work" ............................................................16

B.     Damages ......................................................................19

     1.    Equal Pay Act Damages ................................................19

     2.    Breach of Contract and Iowa Wage Payment Collection Law Damages...................................................................22

         a.    Generalized Arguments..........................................23

         b.    Individualized Arguments .......................................27

            i.    Damage Disclosures .....................................27

            ii.    Inadequate Staff .........................................29

            iii.    Dr. Zahn-Hauser's Breach of Contract Claims ......35

C.     Summary Judgment Conclusion ..................................................44

V.     DECERTIFICATION ...................................................................44

A.     Legal Background.................................................................44

B.     Discussion .........................................................................47

VI.     CONCLUSION .........................................................................57

This matter is before the Court on Mercy Physician Associates, Inc.'s ("defendant") Motion for Summary Judgment (Doc. 85) and on defendant's Motion to Decertify the Collective Action (Doc. 86). Sharon Bertroche, Gina Perri, and Arleen Zahn-Hauser (collectively, "plaintiffs") timely resisted both motions (Docs. 92 (resistance to motion to decertify); 100 (resistance to motion for summary judgment)), and defendant timely filed reply briefs in support of each motion (Docs. 98 (reply in support of motion to decertify); 110 (reply in support of motion for summary judgment)). Defendant also filed an erratum to correct an error that appeared in its brief in support of the motion to decertify. (Doc. 89). Plaintiffs' Motion to Strike Testimony of Dr. Mary Dunn Baker from Defendant's Motion for Summary Judgment is also before the Court. (Doc. 114). Defendant timely resisted plaintiffs' motion to strike. (Doc. 116). The Court heard oral argument on August 23, 2019. For the following reasons, defendant's Motion for Summary Judgment (Doc. 85) is **granted in part and denied in part**, defendant's Motion to Decertify the Collective Action (Doc. 86) is **granted**, and plaintiffs' Motion to Strike (Doc. 114) is **denied**.

## I.    *PROCEDURAL AND FACTUAL BACKGROUND*

On November 3, 2016, plaintiff Sharon Bertroche, M.D., filed a state court petition against defendant alleging a violation of the Iowa Wage Payment Collection Law, Iowa Code Chapter 91A, and a claim for breach of contract. (Doc. 4). On April 27, 2018, Dr. Bertroche amended her state court petition to add a claim for violation of the federal Equal Pay Act, Title 29, United States Code, Section 206(d)(1). (Doc. 6). After Dr. Bertroche added the federal claim, defendant removed the action to this Court on the basis of federal question jurisdiction. (Doc. 1). Subsequently, Dr. Bertroche filed a motion to conditionally certify a collective action under Title 29, United States Code, Section 216(b). (Doc. 14). The Court granted that motion to the extent Dr. Bertroche sought conditional certification. (Doc. 38, at 7). In connection with the conditional

certification, the Court extended certain scheduling deadlines, including the deadlines to add parties and amend pleadings. (Doc. 41, at 5-6). Plaintiff Gina Perri, M.D., and Arleen Zahn-Hauser, M.D., each timely filed a "consent to become a party plaintiff to the claim under the Equal Pay Act, 29 U.S.C. 206(d)(1)" in this case.[1] (Docs. 44, 46).

Dr. Bertroche subsequently moved for leave to file a second amended complaint naming Drs. Perri and Zahn-Hauser as additional plaintiffs on the Equal Pay Act claim (Doc. 47), and the Court granted the motion (Doc. 48). The motion was premised on the Court's previous conditional certification and did not seek leave to add Drs. Perri and Zahn-Hauser as plaintiffs on either of the other two claims. Plaintiffs later filed another motion to amend the complaint under Federal Rule of Civil Procedure 15, that time seeking, among other things, leave "to add additional factual allegations and allegations against [defendant], including . . . breach of contract and wage claims against [defendant] on behalf of Dr. Perri and Dr. Zahn-Hauser." (Doc. 58, at 1-2). The Court granted plaintiffs' motion (Doc. 61), and the Third Amended Complaint ("complaint") was docketed and remains the operative complaint (Doc. 62). *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000) ("It is well-established that an amended complaint super[s]edes an original complaint and renders the original complaint without legal effect." (citation omitted)).

Plaintiffs are all female physicians, each of whom entered into a "Primary Care Physician Employment Agreement" with defendant. (Docs. 62, at 1-2, 7; 63, at 1-3, 12). Under those agreements, each plaintiff worked for defendant as a family practice physician. (Docs. 62, at 7; 63, at 12). The agreements provide that certain administrative responsibilities were delegated to defendant:

---

[1] Roxanne Dunn, M.D., also filed a consent form. (Doc. 45). Dr. Dunn, however, was dismissed from this action and, thus, need not be addressed in this Order. (Doc. 76).

**Office space, equipment, furniture, supplies, etc.** [Defendant] shall provide or arrange to provide office space for Physician . . ., which shall be furnished with all equipment, furniture, supplies and materials reasonably necessary for Physician to perform the duties required hereunder. Moreover, [defendant] shall provide or arrange to provide the repairs and support services for said equipment and furniture.

**Office staff and administrative services.** (a) [Defendant] shall provide or arrange to provide and administratively supervise all personnel reasonably necessary to staff the Clinic, including an office manager, nurses, receptionists, transcriptionists and bookkeepers. [Defendant] agrees to consult with Physician with regard to the quantity, qualifications, hiring, evaluation, discipline and termination of said personnel.

(b) [Defendant] shall provide or arrange to provide all administrative services reasonably necessary for the operation of [Physician's Clinic], including but not limited to personnel management and training, up-to-date policy and procedure manuals, quality improvement and risk management services, billing and collections, accounts payable, office financial reports and statistical information, and promotion of [defendant's] network in the community.

**Physicians and Physician Extenders.** [Defendant] shall use its best efforts to employ those qualified physicians and physician extenders reasonably necessary to assist Physician in the performance of the duties required hereunder and to provide coverage for Physician during time off duty.

(Docs. 85-3, at 40-41 (Dr. Bertroche's contract); *id.*, at 138 (Dr. Perri's contract); *id.*, at 203-04 (Dr. Zahn-Hauser's contract) (paragraph enumerations omitted)).

Dr. Bertroche worked for defendant from 1995 through 2016 (Docs. 105, at 1; 110-1, at 1), Dr. Perri worked for defendant from 2007 through 2017 (Docs. 105, at 1; 110-1, at 1), and Dr. Zahn-Hauser worked for defendant from 2006 through 2019 (Docs. 105, at 1; 110-1, at 1). At least three male physicians also worked for defendant over the course of approximately the same time period. (Docs. 105, at 1-2; 110-1, at 2). Of those three male physicians, two are family practice physicians.[2] (Docs. 105, at 1-2;

---

[2] The third physician is Matthew Fox, M.D. (Docs. 105, at 2; 110-1, at 2). His area of practice

110-1, at 2).

The three male physicians, like plaintiffs, each signed a "Primary Care Physician Employment Agreement" with defendant. (Docs. 105, at 2; 110-1, at 2). The agreements—those signed by plaintiffs and those signed by the male physicians—all contained the same list of "Primary Care Physicians' Duties," and each agreement used the same "Team Bonus Model" compensation program. (Docs. 105, at 2; 110-1, at 2-3). Plaintiffs assert that even though all of defendant's primary care physicians "performed the same basic job duties of examining, evaluating[,] and treating [defendant's] patients" (Doc. 105, at 2), defendant paid its female physicians, including plaintiffs in this case, less than defendant paid its male physicians for substantially equal work in violation of the Equal Pay Act (Docs. 62, at 7-9; 105, at 2-5). In direct response to allegations under the Equal Pay Act, defendant asserts the following affirmative defense:

> Plaintiffs' compensation was marginally different from that of comparable physicians, with differences attributed to their individual and voluntary practice decisions within an evenly applied compensation formula. The physician compensation formula agreed to by [p]laintiffs is evenly applied across physicians and results in compensation based upon quantity and quality of production, including practice revenue minus practice expenses. Defendant does not utilize gender in any manner as a factor for compensation, and allows individual [physicians] flexibility to practice medicine. The disparate practice choices between [p]laintiffs and other physicians of both genders[ ] result in a difference in job compensation.

(Doc. 63, at 19). That is, although defendant acknowledges that each physician received a different amount of total compensation, defendant contends that those differences were based on each physician's specific practice[3] and were not based on a difference in the

---

has not been identified. (Docs. 105, at 2; 110-1, at 2).

[3] Each physician's practice is referred to as his or her "profit center," when referencing the financial aspects of the practice. Each physician also maintains a "reserve fund," which contains

factors used to calculate compensation between men and women. (*See* Doc. 85-1, at 6-8).

When plaintiffs amended their complaint under Federal Rule of Civil Procedure 15, Drs. Perri and Zahn-Hauser each asserted two additional claims in their own names individually. (Doc. 62, at 9-12). Each of those two plaintiffs asserted a claim for breach of her employment agreement and for violation of the Iowa Wage Payment Collection Law, Iowa Code Chapter 91A. (*Id.*). Under Iowa Code Chapter 91A, Drs. Perri and Zahn-Hauser each seek, in part, unpaid wages and liquidated damages. (*Id.*, at 9-11).

Defendant now seeks summary judgment on all claims, except for a liquidated damages claim that Dr. Bertroche has asserted under her Chapter 91A claim. (Doc. 85, at 1). As to the Equal Pay Act claim, defendant moves for summary judgment on two different bases, both of which contain significant legal and factual overlap. First, defendant argues that plaintiffs cannot establish a *prima facie* case of sex discrimination because plaintiffs cannot show that female physicians were compensated at a different rate of pay than male physicians. (Doc. 85-1, at 5-15). Alternatively, defendant argues that it has satisfied the affirmative defense set forth above and, specifically, that defendant has shown "that physicians were paid under a system that measured earnings by production quantity and quality using physician revenue, cost, and profits." (Doc. 85-1, at 15). Finally, defendant argues that all of the claims on which defendant moves must be dismissed because plaintiffs have failed to come forward with a cognizable theory of damages. (*Id.*, at 19-31). Defendant has also filed a motion to decertify the collective action. (Doc. 86). After considering plaintiffs' motion to strike, the Court will first address defendant's arguments under the Equal Pay Act and will then turn to defendant's damages arguments before, finally, addressing whether to decertify the collective action.

---

funds that are used to replenish funds in the physician's profit center, if the profit center is operating at a deficit.

*See Ahle v. Veracity Research Co.*, 738 F. Supp. 2d 896 (D. Minn. 2010) (considering motion for summary judgment before addressing motion for decertification).

## II.    MOTION TO STRIKE

Plaintiffs seek to have Mary Dunn Baker, Ph.D.'s expert witness report stricken from the summary judgment record under Federal Rule of Civil Procedure 12(f). (Doc. 114). In support, plaintiffs assert that, through no fault of their own, they have been unable to depose Dr. Baker and have been prejudiced by their inability to do so. (*Id.*, at 2-3). Plaintiffs further assert that defendant's "failure to produce" Dr. Baker to be deposed "violates [p]laintiffs' right of due process." (*Id.*, at 2).

Plaintiffs filed their motion after summary judgment briefing had closed. Before they filed their resistance, plaintiffs knew they would be doing so without having deposed Dr. Baker. Indeed, Dr. Baker's deposition was initially scheduled to take place several days before plaintiffs' deadline to file their resistance, but defense counsel cancelled that deposition one week before plaintiffs were due to file their resistance. *See* LR 56(b) (permitting a party 21 days to resist a motion for summary judgment); Docs. 85 (motion for summary judgment, filed on June 13, 2019), 114-2, at 1 (email from defense counsel dated June 28, 2019, cancelling the deposition scheduled for July 1, 2019). Plaintiffs did not, however, raise this issue before filing their resistance, or at the time they filed their resistance. The parties rescheduled Dr. Baker's deposition to take place after summary judgment briefing had closed (*see* Doc. 114, at 2),[4] and it was only after this rescheduled deposition was cancelled that plaintiffs raised the prejudice issue. If plaintiffs thought prejudice would result from their inability to depose Dr. Baker before resisting defendant's motion for summary judgment, plaintiffs should have raised this issue at the

---

[4] The emails submitted in support of plaintiffs' motion do not show that the rescheduled deposition was cancelled. At oral argument, however, the parties indicated that Dr. Baker's deposition had been cancelled and, at the time of argument, had not taken place.

time they filed their resistance, at the latest. The Court fails to see how, under these circumstances, prejudice arose from the second cancellation of Dr. Baker's deposition.

The Court enjoys "liberal discretion under Rule 12(f)." *Nationwide Ins. Co. v. Cent. Mo. Elec. Co-op., Inc.*, 278 F.3d 742, 748 (8th Cir. 2001). "Motions to strike under [Rule] 12(f) are viewed with disfavor and are infrequently granted." *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir. 1977) (citation omitted). Here, the Court will not strike Dr. Baker's report from the summary judgment record. Plaintiffs knew, one full week before filing their resistance, of the potential prejudice that may result from crafting their resistance without having deposed Dr. Baker. Even so, plaintiffs did not claim prejudice at that time, or at any time thereafter, until after summary judgment briefing had closed, nor did plaintiffs seek an extension of the deadline to file their resistance on this basis.[5] Plaintiffs' motion to strike (Doc. 114) is **denied**.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may "show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, "[a] party

---

[5] Before Dr. Baker's deposition was cancelled the first time, plaintiffs did seek an extension of time for unrelated reasons, and the Court denied that motion. (Docs. 90, 91). At no time did plaintiffs seek an extension of time to permit the parties to reschedule Dr. Baker's deposition such that the deposition would occur before plaintiffs filed their resistance.

may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law . . .." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citation omitted). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific facts showing that there is a genuine issue for trial. *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587-88 (citation omitted); *see also*

*Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them" (omission in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007))). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation omitted). "Rather, the court's function is to determine whether a dispute about a material fact is genuine . . .." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## IV. SUMMARY JUDGMENT ANALYSIS

### A. Equal Pay Act

The Equal Pay Act, Title 29, United States Code, Section 206, is one of many provisions contained within the Fair Labor Standards Act, Title 29, United States Code, Sections 201, *et. seq.* Under the Equal Pay Act, an employer may not discriminate against employees "on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility . . .." 29 U.S.C. § 206(d)(1). An action to recover damages under the Equal Pay Act "may be maintained against any employer . . . by one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).

The Eighth Circuit Court of Appeals has addressed how a plaintiff may establish liability under the Equal Pay Act, as well as those affirmative defenses that are available in defending against an Equal Pay Act claim:

> A plaintiff must first establish a *prima facie* case that women were paid less than men in the same establishment for equal work requiring equal skill, effort, and responsibility and performed under similar working conditions. If a plaintiff establishes a *prima facie* case, the burden then shifts to the

defendant to prove one of four statutory affirmative defenses. *Id.* at 1081. Those defenses require an employer to prove that any wage differential is explained by "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). In an [Equal Pay Act] case, a defendant cannot escape liability merely by articulating a legitimate non-discriminatory reason for the employment action. [The defendant] must prove that the pay differential was based on a factor other than sex.

Claims under the [Equal Pay Act] generally have a two[-]year statute of limitations. 29 U.S.C. § 255(a). Evidence of wage discrimination need not be confined to the [Equal Pay Act's] two[-]year limitation period, however, for a court may consider relevant evidence from before that period while assessing the worker's claims.

*Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011) (internal citations, quotation marks, and alterations omitted).

### 1.    Sex-Based "Wage Rates"

In arguing that plaintiffs cannot establish a *prima facie* case of wage discrimination based on sex, defendant first asserts that the Court must look beyond total compensation and examine whether plaintiffs were paid at *rates* equal to their male counterparts. From there, defendant argues that plaintiffs' Equal Pay Act claims must fail because "[p]laintiffs have not, and cannot, set forth any differing 'wage rate.'" (Doc. 85-1, at 10). The Court agrees that the operative question is the "rate" at which plaintiffs were paid, as compared to defendant's male physicians. The Court finds, however, that plaintiffs have generated a genuine issue as to whether plaintiffs were paid at a different "rate" than defendant's male physicians.

In *Broadus v. O.K. Industries, Inc.*, the Eighth Circuit Court of Appeals held that "[t]o establish a violation of the Equal Pay Act, an employee must demonstrate that the employer paid male and female employees different wage *rates* for substantially equal work." 226 F.3d 937, 941 (8th Cir. 2000) (emphasis added) (citation omitted). In the

more recent case of *Price v. Northern States Power Co.*, however, the Eighth Circuit explained what a plaintiff must show to establish a *prima facie* case *without* referencing a "wage rate" or "rate of pay:" "A plaintiff must . . . establish a *prima facie* case that women were paid less than men in the same establishment for equal work requiring equal skill, effort, and responsibility and performed under similar working conditions." 664 F.3d at 1191.

It is unclear to this Court whether the Eighth Circuit intended to modify the relevant inquiry by omitting any explicit reference to "wage rate" or "rate of pay," or whether *Price* articulates the same "wage rate" inquiry in different terms. The Equal Pay Act, however, explicitly refers to "wage rate" multiple times and prohibits "wage rate" discrimination:

> No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . *at a rate less than the rate* at which he pays wages to employees of the opposite sex . . . an employer who is paying a *wage rate differential* in violation of this subsection shall not . . . reduce the *wage rate* of any employee.

29 U.S.C. § 206(d)(1) (emphasis added). In the absence of clear precedent to the contrary, the Court will follow the language of the statute and will consider whether plaintiffs have generated a genuine issue of fact as to whether they were paid at a different "rate" than their male counterparts.

The Court finds that there is a genuine dispute as to whether plaintiffs were compensated at a different "rate" than their male counterparts. Put simply, the Court cannot discern, on this record, how each physician's compensation was determined. Defendant argues that the wage rate was simply revenue minus expenses equals income. (Doc. 85-1, at 12). Although defendant asserts that there cannot be a difference in the "wage rate" because each physician's compensation is calculated under this identical formula (Doc. 85-1, at 8-11), defendant has not proven that the variables inputted into

that formula are identical such that all "wage rates" must also be identical.[6] Defendant controls factors that can affect doctors' revenue and expenses. As noted, defendant has a responsibility under the contract to provide facilities and staffing for the doctors. If, for example, defendant provided male doctors with better staffing support than they did female doctors, then by its conduct defendant may have intentionally or unintentionally affected female doctors' ability to generate revenue and minimize expenses. Defendant has provided the Court with volumes of compensation data, but defendant has not provided an interpretation of that data sufficiently for the Court to determine whether all physicians were, in fact, paid according to the same "wage rate." Defendant has not shown that female doctors and male doctors were provided the same revenue or expenses. Defendant has, then, failed to show that plaintiffs are incapable of demonstrating that they were paid a different "wage rate" than defendant's male physicians. Thus, summary judgment is inappropriate on this issue, and defendant's motion is **denied** to the extent defendant asserts that plaintiffs cannot show they were paid a different "wage rate" than defendant's male physicians.

Similarly, defendant has not shown entitlement to summary judgment based on their affirmative defense that physicians were compensated based on "a system that measured earnings by production quantity and quality using physician revenue, cost, and profits."[7] (Doc. 85-1, at 15). Plaintiffs have produced evidence showing that even if

---

[6] Defendant does not assert that there is a single numerical "wage rate" that determines each physician's total compensation. Rather, defendant's position is that this formula provides the rate at which each physician is compensated. It is unclear, however, whether defendant asserts that the *formula* is the "wage rate," or whether the *sum* of the formula is the "wage rate."

[7] Plaintiffs argue that defendant is not entitled to summary judgment because defendant has not shown that its physicians received different amounts of compensation based on a factor other than sex. (Doc. 102, at 10-14). It is unclear whether plaintiffs understand defendant to be asserting the fourth affirmative defense—that the wage differential was "based on any other factor other than sex," 29 U.S.C. § 206(d)(1)(iv)—or whether plaintiffs are arguing that a defendant asserting any of the first three affirmative defenses enumerated in Section 206(d)(1)

this system was used to determine compensation, sex also played a role in determining each plaintiff's "wage rate." This is sufficient to defeat defendant's motion for summary judgment based on its affirmative defense. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 248 (1989) ("[A]lthough the Equal Pay Act expressly permits employers to pay different wages to women where disparate pay is the result of a 'factor other than sex,' . . . it is the employer, not the employee, who must prove that the actual disparity is not sex linked." (citations omitted)), *superseded by statute on other grounds, as stated in Burrage v. United States*, 571 U.S. 204, 213 n.4 (2014); *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995) ("[D]efendant[ ] must show that the factor of sex provided *no basis* for the wage differential." (emphasis in original) (citation and internal quotation marks omitted)), *disagreed with on other basis by Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d 796, 799 n.7 (6th Cir. 1998).

As articulated in *Price*, "the defendant must prove that the pay differential was based on a factor other than sex," and a defendant will not meet its burden simply "by articulating a legitimate non-discriminatory reason for the employment action." 664 F.3d at 1191 (citation and internal quotation marks omitted). "'The burden of proving that a factor other than sex is the basis for a wage differential is a heavy one.'" *Fagen v. Iowa*, 301 F. Supp. 2d 997, 1007 (S.D. Iowa 2004) (quoting *Brennan v. Owensboro-Daviess Cty. Hosp.*, 523 F.2d 1013, 1031 (6th Cir. 1975)). Plaintiffs' expert, David C. Sharp, Ph. D., has opined that "after controlling for gender-neutral factors, the reduction in total compensation attributable to gender alone equals approximately 22%." (Doc. 95-1, at

---

must also prove that differing wages are due to a factor other than sex. Although it is unclear which argument plaintiffs are advancing, the Court finds, as discussed below, that defendant's affirmative defense cannot succeed unless defendant shows that sex played no role in the wage differentials. The Court also notes that at oral argument, defendant clarified that it is asserting the third affirmative defense—that the wage differential was because the compensation system "measures earnings by quantity or quality of production." *See id.* § 206(d)(1)(iii).

14).

Based on this evidence, a reasonable factfinder could conclude that sex played at least some role in the wage rate disparities and that the disparities were not, in fact, due solely to the compensation system that defendant employed that purports to base compensation on quality and quantity. *See Stanziale v. Jargowsky*, 200 F.3d 101, 107-08 (3d Cir. 2000) (holding that when an employer relies on an affirmative defense, the employer is required to "submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity" (emphasis in original) (citation omitted)). *See also Mansfield v. United States*, 71 Fed. Cl. 687, 693 (Fed. Cl. 2006) ("To successfully demonstrate that the pay differential is justified under one of the four exceptions, an employer must prove that the gender-neutral factor it identified is actually the factor causing the wage differential in question." (citation omitted)). Thus, defendant has failed to meet its burden to show that there is no genuine dispute as to whether sex was a reason for the differing wage rates that plaintiffs allege, and defendant is not entitled to summary judgment on its affirmative defense. Defendant's motion for summary judgment is **denied** to the extent defendant seeks summary judgment based on this affirmative defense.

### 2. *"Equal Work"*

Defendant's second argument as to why plaintiffs cannot establish a *prima facie* case amounts to an argument that plaintiffs did not perform "equal work" as defendant's male physicians.[8] Defendant argues that each physician "who work[s] under the [Primary Care Physician Employment Agreement] operate[s] their own small business." (Doc. 85-1, at 13). In support, defendant provides the following assertions:

---

[8] Defendant also asserts that no plaintiff performed "equal work" as either of the other two plaintiffs.

16

[1.] Every physician provides medical care to different patient mixes, who require different medical care, and have different insurance.

[2.] Every physician conducts a different number of patient visits, and during reasonable clinic hours set by the physician.

[3.] Every physician determines how they provide medical care to their patients, and the efficiency at which they proceed through daily schedules. Physicians can [choose] to spend extra time providing patients with medical education, or discussing non-medical issues.

[4.] Every physician controls the number of and how to utilize clinic staff within their medical practice, and has different management styles and effects on turnover and staff productivity.

[5.] Every physician has the opportunity to incorporate nurse practitioners or physician's assistant[s] into their profit centers. Some physicians utilize that opportunity effectively, others not, and still others believe in a strict physician-patient interaction.

(*Id.*, at 13-14).

In response, plaintiffs argue that each physician defendant employed had the same "primary care physician's duties," as set forth in each physician's "Primary Care Physician Employment Agreement," and that those duties involved "provid[ing] medical services to [defendant's] patients in clinical and hospital settings, including examinations, evaluations[,] and treatment." (Doc. 102, at 8). Further, plaintiffs assert that each physician's position "required the same basic experience, knowledge[,] and training." (*Id.*). Given the identical duties and qualifications required, plaintiffs argue that a reasonable jury could find plaintiffs performed work that was "equal" to the work performed by defendant's male physicians.

"[J]obs need not be identical to be considered 'equal' under the [Equal Pay Act]; they need only be substantially equal." *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002) (citation omitted). "Whether two jobs are substantially equal requires a practical judgment on the basis of all the facts and circumstances of a particular case, including factors such as level of experience, training, education, ability, effort,

and responsibility." *Lawrence v. CNF Transp., Inc.*, 340 F.3d 486, 492 (8th Cir. 2003) (citation and internal quotation marks omitted). "Two jobs could require insubstantial or minor differences in the degree of amount of skill, or effort, or responsibility and still be substantially equal. The same is true for insubstantial or minor differences in supervisory responsibility." *Hunt*, 282 F.3d at 1030 (citations, internal quotation marks, and alterations omitted). "Application of the Equal Pay Act depends not on job titles or classifications but on the actual requirements and performance of the job." *Lawrence*, 340 F.3d at 492 (citation and internal quotation marks omitted). "In all cases, therefore, a court must compare the jobs in question in light of the full factual situation and the broad remedial purpose of the statute." *Id.* (citation and internal quotation marks omitted).

The caselaw shows that determining whether two jobs are substantially equal is a fact-intensive inquiry. Here, a reasonable factfinder could find that plaintiffs' jobs were substantially equal to those of defendant's male physicians. The factfinder has some degree of latitude in determining which differences between jobs are "insubstantial," such that the jobs may still be substantially equal in spite of those differences. *See, e.g.*, *id.* at 492 (finding that the jury could have found a factual difference insubstantial). Although defendant asserts that each physician develops and runs his or her own practice differently, the physicians whose compensations are being compared all worked for defendant as family practice physicians, and all signed copies of the same "Primary Care Physician Employment Agreement."

Defendant's evidence and argument that the physicians' jobs are not substantially equal, although potentially probative, are not conclusive. There is competing evidence as to whether the jobs were substantially equal, and a reasonable jury could find in plaintiffs' favor on this issue on the record that has been established thus far. Summary judgment in defendant's favor on this issue is, thus, unwarranted. *See Celotex Corp.*,

477 U.S. at 322-23.

The Court has rejected both arguments defendant has offered as to plaintiffs' ability to establish a *prima facie* Equal Pay Act claim. Thus, to the extent defendant's motion for summary judgment is premised on plaintiffs' inability to establish a *prima facie* Equal Pay Act claim, defendant's motion is **denied**. Similarly, the Court has rejected defendant's argument that it is entitled to summary judgment based on the affirmative defense discussed above. Defendant's motion for summary judgment is **denied** to the extent defendant argues that it is entitled to summary judgment based on the aforementioned affirmative defense.

## B. *Damages*

Defendant next argues that it is entitled to summary judgment on most of plaintiffs' claims due to plaintiffs' inability to satisfy the damages elements of those claims:

> Plaintiffs have not and cannot substantiate their damage claims under . . . the Equal Pay Act, for breach of contract, or for wage nonpayment under Iowa Code Chapter 91A. Plaintiffs each rely upon expert reports and, to that extent, their damage disclosures are similar. Plaintiffs additionally offer diverging damage theories. In sum, their failure to disclose, compute, and support damages makes their Equal Pay Act claims, breach of contract claims, and all but a limited portion of [Dr.] Bertroche's Chapter 91A claim ripe for dismissal.

(Doc. 85-1, at 19).

## 1. *Equal Pay Act Damages*

Defendant first argues that "[p]laintiffs have no competent proof of damages under the Equal Pay Act" because "[p]laintiffs [have] fail[ed] to identify any differential in rate as between male and female physicians, and there is a commensurate failure to articulate the amount of damages needed to make [plaintiffs] whole." (Doc. 85-1, at 19). The Court has found that there is a genuine dispute as to whether plaintiffs were compensated at a different "wage rate" than defendant's male physicians. At this stage, plaintiffs have

produced evidence, in the form of an expert opinion by Dr. Sharp, that the sex-based wage rate differential was approximately twenty-two percent. (Doc. 95-1, at 14). As defendant points out, should plaintiffs prevail on their Equal Pay Act claims, "plaintiffs are entitled to recover an amount representing the difference between their actual wage and that which they would have received in the absence of impermissible wage rate discrimination, and may recover an equal amount of liquidated damages." (Doc. 85-1, at 19 (citing 29 U.S.C. §§ 216(b), 260)). *See also Ashley v. Boyle's Famous Corned Beef Co.*, 66 F.3d 164, 168 (8th Cir. 1995) (holding that a successful plaintiff in an Equal Pay Act case "may recover for unequal paychecks"), *abrogated on other grounds as noted in Rowe v. Hussmann Corp.*, 381 F.3d 775, 782 n.6 (8th Cir. 2004).

Dr. Sharp has provided a legally sound damages calculation sufficient for plaintiffs' Equal Pay Act claims to survive summary judgment. Should the factfinder find in plaintiffs' favor, the factfinder could also find that the twenty-two percent differential between wages paid to male and female physicians represented the differential that plaintiffs would have been paid in the absence of unlawful sex-based discrimination. Should the factfinder make these findings, the twenty-two percent differential would not be a legally improper measure of damages.

To the extent defendant argues that Dr. Sharp lacked sufficient information to accurately calculate damages (Doc. 85-1, at 20, 20 n.7-8), and to the extent defendant argues that Dr. Sharp's methodology is unreliable or unknown (*id.*, at 20-21), the Court construes this as an argument that Dr. Sharp's wage differential calculation would be inadmissible at trial. *See* FED. R. CIV. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Assuming this is a *Daubert* argument, defendant has not substantiated the argument such that the Court finds the issue ripe for adjudication. Defendant has cited no procedural or other legal basis for excluding Dr. Sharp's calculation or opinions

at this stage of the litigation, and defendant has not requested that the Court exclude or limit Dr. Sharp's testimony at trial. Similarly, defendant has not articulated the argument that because Dr. Sharp's calculation and/or opinions would be inadmissible at trial, the Court should decline to rely on those calculations and opinions at the summary judgment stage. Although the Court finds that these arguments have not been sufficiently raised, the Court will address them to the extent possible, on the record now before the Court.

Defendant asserts that Dr. Sharp does not "quantif[y]" what the twenty-two percent would equate to, identify "the average male and average female goalposts between which his regression percentage applies," or identify in his report which "individual factors [Dr. Sharp] used to calculate[ ] physician profits." (Doc. 85-1, at 20-21). Defendant has not, however, alleged or shown why these considerations would render Dr. Sharp's calculation or opinions inadmissible. Defendant further asserts that Dr. Sharp's analysis excluded certain "core variables used to calculate physicians' profits," but defendant has not explained why the exclusion of these "variables" renders Dr. Sharp's analysis so unreliable that it would be inadmissible. (*Id.*, at 20). Indeed, on the record before the Court, the deficiencies defendant has alleged would be more properly addressed through vigorous cross examination and presentation of contrary evidence than through exclusion of Dr. Sharp's calculation, opinions, or testimony. *See Daubert v Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Thus, to the extent defendant argues that Dr. Sharp's calculation or opinions would be inadmissible at trial and so should not be relied on at the summary judgment stage, the Court rejects that argument. The Court finds that plaintiffs have propounded a cognizable damages theory on their Equal Pay Act claims. Defendant's motion for

summary judgment is **denied** to the extent the motion is premised on plaintiffs' inability to prove the damages element of the Equal Pay Act claims.

> **2.    *Breach of Contract and Iowa Wage Payment Collection Law Damages***

Plaintiffs' breach of contract claims were brought for defendant allegedly having "violated its contractual obligations . . . on multiple fronts, including failing to provide the skilled staffing and administrative support [that] were essential to [p]laintiffs' financial success."[9]  (Doc. 102, at 3).  Plaintiffs assert that these breaches caused each plaintiff "significant financial harm and resulted in unpaid wages."  (*Id.*).  Plaintiffs also argue that it is unclear whether they were correctly paid under the compensation scheme outlined in their contracts, which forms a basis for plaintiffs seeking unpaid wages under both their breach of contract claim and under Iowa Code Chapter 91A.  (*Id.*, at 19-21).  Plaintiffs further assert that defendant did not provide them with the financial information necessary to determine whether they were paid properly, nor did defendant provide them with the financial information plaintiffs needed to close out their medical practices.  (*Id.*, at 20-21).  Each failure, plaintiffs allege, constitutes a violation of Section 4.4(e) of each respective plaintiff's Primary Care Physician Employment Agreement and of Iowa Code Section 91A.6.  (*Id.*).

In arguing in favor of summary judgment, defendant offers several theories, some of which are common to all plaintiffs, and some of which are made only as to individual

---

[9] The actions plaintiffs allege amounted to defendant breaching its contractual obligations are related to, but are not the same as, a basis for plaintiffs' Equal Pay Act claims.  Defendant's inadequate staffing of female doctor's office may have led to female doctors being compensated at a different rate of pay than male doctors because it decreased the amount of revenue female doctors could earn.  The inadequate staffing need not, however, rise to the level of breaching the contract, however, to have influenced the rate of female doctors' pay.  At the same time, the inadequate staffing may have breached the contract irrespective of the doctor's gender.  So plaintiffs need not prevail on the contract claims to prevail on the Equal Pay Act claims, or vice versa.

plaintiffs.  The Court will first address the theories that are common to all plaintiffs and will then turn to the plaintiff-specific arguments.

### a.    *Generalized Arguments*

Defendant asserts that the only damages theory that plaintiffs have offered in support of their state law claims is the theory offered by plaintiffs' expert Ronald Nielsen. (Doc. 85-1, at 21-22).  That theory, defendant argues, does not calculate damages based on the compensation scheme set forth in each plaintiff's contract but, rather, calculates damages based on whether plaintiffs were paid "reasonably." (*Id.*, at 23-24 (citation and internal quotation marks omitted)).  Defendant maintains that this is an improper calculation of damages because the parties contractually agreed that plaintiffs would be compensated according to a different formula, and it is this formula, if any, that should be employed to determine the damages to which each plaintiff may be entitled. (*Id.*). Defendant's argument applies to plaintiffs' breach of contract claims, to the extent those claims seek unpaid wages, and to plaintiffs' Chapter 91A claims, as is explained below.[10] Defendant offers no other argument in favor of summary judgment as to plaintiffs' Chapter 91A claims.  Defendant's remaining arguments under the breach of contract claims will be discussed in the next section.

Although defendant's motion indicates that this argument is intended to apply to the entirety of the breach of contract claims, defendant has applied this argument to only one aspect of each breach of contract claim.  Specifically, defendant argues that Mr. Nielsen's methodology is an improper way of calculating unpaid wages. (*See id.*, at 21-24).  Defendant does not argue the applicability, if any, of Mr. Nielsen's methodology and calculations to other aspects of the breach of contract claims, such as plaintiffs'

---

[10] Defendant does not address each plaintiff's allegation that defendant failed to provide her with "a written itemized statement that includes deductions made, together with an explanation of how the deductions were computed," as required by Iowa Code Section 91A.6(3).  (Doc. 62, at 6, 9, 11).  The Court, likewise, will not address these allegations.

allegations that defendant did not provide plaintiffs with appropriate staff.  Thus, this argument, if successful, would not dispose of the breach of contract claims in their entirety.

Each plaintiff's employment contract contains an Iowa choice of law clause, and no party contests whether Iowa law governs the contracts.  (Docs. 85-1 (defendant's brief asserting that Iowa law governs); 85-3, at 47, 145, 210 (contracts); 102, at 18, 18 n.6 (plaintiffs' brief addressing the breach of contract claims under Iowa law)).  Iowa law requires that a plaintiff asserting breach of contract prove that she suffered damages.  *Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 706 (Iowa 2016) (citations omitted).  When an employer pays an employee under an agreement, the employee may bring suit under the Iowa Wage Payment Collection Law for non-payment of those wages.  *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 202 (Iowa 1997) (citing IOWA CODE § 91A.2(7)).  Each plaintiff, here, has done just that and seeks to use Chapter 91A to collect wages allegedly due to her under her Primary Care Physician Employment Agreement.[11]

"The purpose of the Iowa Wage Payment Collection Law is to facilitate the

---

[11] In its reply brief, defendant argues that by asserting that "'[defendant] still cannot show [it] paid [p]laintiffs correctly under their contracts,'" plaintiffs invoke only breach of contract principles but do not invoke unpaid wage principles.  (Doc. 110, at 10 (quoting Doc. 102, at 19)).  Plaintiffs, however, seek unpaid wages that defendant agreed to pay plaintiffs under their employment contracts.  If defendant did, in fact, fail to pay all wages owed to plaintiffs, that failure would constitute both a breach of contract and a violation of Chapter 91A as to the plaintiff who was improperly paid.  *See Rasch v. Tyson Fresh Meats, Inc.*, Nos.C16-3006-LTS, C16-3102-LTS, 2017 WL 2219985, at *10-11 (N.D. Iowa May 19, 2017) (holding that a plaintiff can use Chapter 91A to seek payment of wages that an employer was contractually obligated to pay); *Dallenbach v. MAPCO Gas Prods., Inc.*, 459 N.W.2d 483, 488 (Iowa 1990) (same).  Thus, under the facts of this case, each plaintiff may seek damages for this same harm under a breach of contract theory, an unpaid wages theory, or both, provided that no plaintiff ultimately receives double recovery.  *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 770 (Iowa 1999) ("A successful plaintiff is entitled to one, but only one, full recovery, no matter how many theories support entitlement." (citation and internal quotation marks omitted)).

collection of wages owed to employees. An employer must pay all wages due its employees. IOWA CODE § 91A.3(1)." *Phipps*, 558 N.W.2d at 201-02 (internal citations omitted). Defendant does not contest whether the damages plaintiffs seek are considered "wages," and the Court will assume, without deciding, that the damages sought are "wages."

Defendant argues that Mr. Nielsen's damages calculation is based on preliminary recitals in the employment contracts "that have no obligatory effect" and should not be considered in assessing the amount of damages sustained, if any.[12] (Doc. 85-1, at 22-24). As such, defendant takes the position that Mr. Nielsen's calculations are inaccurate because they were formulated based on the preliminary recitals, instead of the compensation scheme that the contracting parties agreed upon. (*Id.*). Thus, defendant's argument is that Mr. Nielsen's report and calculations are based on a flawed methodology. Challenges to Mr. Nielson's methodology are more properly addressed through cross examination and presentation of contrary evidence than through excluding Mr. Nielsen's opinions. *Daubert*, 509 U.S. at 596. To the extent Mr. Nielsen's calculations may be based on information that would not form a proper basis for recovery, those issues may be addressed through jury instructions. *Id.*

---

[12] The parties have included different versions of Mr. Nielsen's report in their respective appendices. The version included in defendant's appendix is dated November 20, 2017 (Doc. 85-4, at 147), while the version included in plaintiffs' appendix is dated May 23, 2019 (Doc. 95-2, at 1). Although defendant's citations are to defendant's own appendix, it appears that defendant intended to cite to the version of Mr. Nielsen's report that appears in plaintiffs' appendix. The Court finds this likely because in its brief, defendant quotes the following language that is attributed to Mr. Nielsen: "[t]he employment agreements . . . indicate several objectives [that] include the following: (a) provide fair and stable compensation; (b) maintain a reasonable relationship between earnings and level of effort; and (c) provide an incentive to maintain or increase productivity." (Doc. 85-1, at 22-23). Defendant's citation indicates that this quotation should appear in paragraph nine of the November 20, 2017 report. This language does not, however, appear anywhere in that report. Instead, this language appears in paragraph ten of the May 23, 2019 report. (*See* Doc. 95-2, at 3).

It may prove difficult, in this case, to calculate the amount of plaintiffs' unpaid wages, if the factfinder determines that plaintiffs were not paid all wages owed to them. "[M]ere difficulty in ascertaining the amount of damages does not alone," however, "constitute a cause for denial of recovery." *Dealers Hobby, Inc. v. Marie Ann Realty Co.*, 255 N.W.2d 131, 134 (Iowa 1977) (citation omitted). "If the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or [ap]proximated." *Bangert v. Osceola Cty.*, 456 N.W.2d 183, 190 (Iowa 1990) (citation, internal quotation marks, and alteration omitted). Although defendant has argued that Mr. Nielsen's damages calculation is an improper measure of damages, defendant has not asserted that there is no "reasonable basis" from which plaintiffs' damages, if any, could be approximated. Indeed, if the contractual compensation scheme is as simple as defendant purports it to be (*see* Doc. 110, at 6-9),[13] the factfinder will be able to calculate plaintiffs' damages based on the raw data itself, rather than by accepting or rejecting an expert witness' opinion. Thus, even if Mr. Nielsen's calculations do not properly account for plaintiffs' damages, rejection of these calculations would not form a proper basis to grant summary judgment in

---

[13] Defendant asserts that the compensation scheme "was a pure production and quality-based model found in the Primary Care Physician Employment Agreements:

$$(\textit{Practice Revenues}) + (\textit{Non-Practice Revenues}) - (\textit{Expenses})$$
$$= \textit{Profit Center Balance}$$
$$= \textit{Total Available for Physician Compensation}.\text{"}$$

(Doc. 85-1, at 12).

Although this equation looks straightforward, numerous factors influence each variable, and, as discussed below, a physician does not necessarily receive the entirety of her profit center balance as compensation. The Court has gone through the voluminous record in an attempt to discern, definitively, how each physician was compensated, and the Court has been unable to reach a sound conclusion. Thus, the Court cannot ascertain, with exactitude, how each physician was compensated, but the Court is persuaded that the compensation scheme was not as simple as defendant purports it to be.

defendant's favor.

Similarly, although defendant has *alleged* that plaintiffs were properly compensated and, thus, did not sustain damages, defendant has not shown this to be indisputably true. As discussed, there is competing evidence not only on the amount of damages plaintiffs sustained, but also on whether plaintiffs have sustained damages at all. As noted in discussing plaintiffs' Equal Pay Act claim, defendant has not interpreted the compensation data of record, and the Court is thus unable to tell, in the absence of that interpretation, how plaintiffs were compensated. This leaves the Court unable to discern whether plaintiffs were compensated properly. If plaintiffs were properly compensated, they will have no claim for unpaid wages under either their breach of contract theory or their Chapter 91A theory. The issue of proper compensation is, thus, material to the unpaid wages aspects of plaintiffs' case. In the face of these genuine disputes of material fact, summary judgment is inappropriate. *See Celotex Corp.*, 477 U.S. at 322-23. Defendant's motion for summary judgment is **denied** on plaintiffs' Chapter 91A claims and **denied** as to the issue of damages on plaintiffs' breach of contract claims, to the extent those claims seek payment of unpaid wages.

### b. *Individualized Arguments*

### i. *Damage Disclosures*

Defendant also makes individualized arguments in favor of summary judgment as to certain claims. As to Dr. Bertroche's claims for unpaid wages and breach of contract, defendant asserts as follows:

> Apart from liquidated damages under Iowa's Wage Payment Collection Laws for payment of her 2016 practice closeout, [Dr.] Bertroche does not provide a damage disclosure or calculation (and supportive evidence) for any other claim. Disclosure and proof of damages is a required element. Without that evidence, this Court must dismiss all of Dr. Bertroche's other claims for breach of contract and wage non-payment. Her claim for liquidated damages under the [Iowa Wage Payment Collection

Laws] may remain for trial.

(Doc. 85-1, at 25).

As outlined above, plaintiffs' breach of contract and Chapter 91A claims each allege numerous harms for which they seek damages. In asserting that Dr. Bertroche has not disclosed her damages for "other claims for breach of contract and wage non-payment," defendant has left the Court to guess as to what those "other claims" may be. The Court will not grant summary judgment as to the entire body of "other claims" that could exist under Dr. Bertroche's breach of contract and Chapter 91A claims without knowing, definitively, what those "other claims" are.

Similarly, defendant states that Dr. Perri "claims damages" only for her Equal Pay Act and Chapter 91A claims, as well as her breach of contract claim, to the extent that claim seeks unpaid wages and damages for inadequate staffing. (*Id.*, at 25-26). Defendant goes on to argue that "all other breaches of contract and claims of wage non-payment that Dr. Perri raises must be dismissed." (*Id.*, at 26 n.11). As with Dr. Bertroche's claims, the Court will not grant summary judgment as to these "other" portions of Dr. Perri's breach of contract and wage non-payment claims, without those "other" claims for which defendant seeks summary judgment having been identified.

Defendant has also not provided any legal authority upon which the Court could grant summary judgment for non-disclosure of damages or damages calculations. Defendant is responsible for informing the Court of the legal basis for defendant's motion, and defendant has failed to do so. *Hartnagel*, 953 F.2d at 395 ("Procedurally, the movant has the initial responsibility of informing the district court of the basis for its motion . . . ." (citation omitted)). The Court will not take on this obligation for defendant. Defendant's motion for summary judgment on the "other claims" articulated in this discussion is **denied**.

### ii.    *Inadequate Staff*

As explained above, included in plaintiffs' breach of contract claims is the claim that defendant did not provide plaintiffs with "the skilled staffing and administrative support [that] were essential to [p]laintiffs' financial success." (*See* Doc. 102, at 3). Defendant moves for summary judgment on this claim, as it has been asserted by Dr. Perri.[14]   (Doc. 85-1, at 26-29).   Defendant does not explicitly move for summary judgment on this claim as asserted by Dr. Bertroche, and the Court has rejected defendant's catch-all argument that defendant is entitled to summary judgment on those "other claims" for which Dr. Bertroche did not provide damages disclosures.  Defendant does not move for summary judgment, either explicitly or implicitly, on Dr. Zahn-Hauser's staffing claim.

Under this claim, Dr. Perri asserts that defendant breached its contract with Dr. Perri by failing to "properly staff [Dr. Perri's] clinic" in violation of the Primary Care Physician Employment Agreement that Dr. Perri entered into with defendant. (Doc. 102, at 26).  Had defendant "properly" provided Dr. Perri with clinic staff, Dr. Perri asserts that she would have been able "to treat more than 700 patients in a month," which is a greater volume of patients than Dr. Perri was able to treat without proper staff. (*Id.*). The increased volume, Dr. Perri argues, would have increased her revenue, which would have resulted in Dr. Perri receiving higher compensation.  (*Id.*).

Dr. Perri asserts that this increased volume of patients would have resulted in her

---

[14] Plaintiffs' brief contains one sentence that suggests that Dr. Perri's staffing claim is brought under both her breach of contract claim and her Chapter 91A claim. (Doc. 102, at 27 (concluding staffing argument by stating that "[t]his Court should deny summary judgment and allow Dr. Perri to present her breach[ ]of[ ]contract and Iowa Code 91A claims to the jury")).  Defendant has moved for summary judgment only under the breach of contract theory, and the Court will, then, only address Dr. Perri's staffing claim under a breach of contract theory. (*See* Doc. 85-1, at 26 (identifying the claim as one for lost profits and construing the claim using breach of contract terminology)).

compensation exceeding $500,000 per year. (*Id.*, at 26-27). In support of this figure, Dr. Perri turns to the compensation she received over select time periods. (*Id.*). Specifically, in the fiscal year 2016, Dr. Perri had a salary/draw of $265,647 per year. (*Id.*). In the first quarter of that year, Dr. Perri asserts that "she was able to consistently treat between 500 and 650 patients per month[,] resulting in a bonus that quarter of more than $62,000, from which $58,357 was paid to her." (*Id.*, at 26-27). Dr. Perri multiplied this $58,357 quarterly bonus by four and added that sum to her actual salary from the same fiscal year to calculate what Dr. Perri contends was her earning potential. (*Id.*).

Dr. Perri also turns to her income statements from June 2016, when Dr. Perri contends she was provided "with the reasonably necessary staff and resources." (*Id.*, at 26). That month, Dr. Perri treated 728 patients and generated higher revenue as a result. (*Id.*). Had defendant met its contractual staffing obligations, Dr. Perri asserts, she consistently would have met her goal of treating 700 patients per month and would have realized greater compensation as a result. (*Id.*, at 26-27).[15]

Defendant argues that Dr. Perri's calculation is overly speculative because 1) there is no evidence that patient demand could support Dr. Perri's alleged ability to treat 700 patients per month, and 2) the alleged damages do not account for additional variable

---

[15] Dr. Perri also references another male physician's hourly compensation, which was $250, compared to Dr. Perri's $100. (Doc. 102, at 27). Dr. Perri asserts that had she too been paid $250 per hour, "she would have made more than $500,000.00 per year." (*Id.*). Dr. Perri does not assert that defendant was contractually obligated to pay Dr. Perri $250 per hour, nor does Dr. Perri explain the relevance of this pay differential to her breach of contract claim. In the absence of an explanation, the Court is unable to determine what relevance this differential may have to that claim. If Dr. Perri intends to use this differential to support her Equal Pay Act claim, Dr. Perri has not referenced the differential in conjunction with that claim, nor has Dr. Perri analyzed the relevance of the differential for that claim. The Court has not considered this alleged differential in analyzing whether to grant defendant's motion as to any claim. Even if the Court were to consider this differential under the Equal Pay Act claim, the differential would not be dispositive because it is unknown whether Dr. Perri's job was substantially equal to that of the physician who was compensated at the higher rate.

costs that would be incurred as a result of hiring more staff. (Doc. 85-1, at 27-29). Defendant also argues that Dr. Perri is not qualified as an expert on the issue of damages and that she lacks "sufficient personal knowledge to present her own alleged lost income damages." (*Id.*, at 29).

"Lost profits are . . . a permissible item of damages so long as the profits are not based on conjecture and speculation." *Yost v. City of Council Bluffs*, 471 N.W.2d 836, 840 (Iowa 1991) (citations omitted). Lost profit damages need only be proven with reasonable certainty to be recoverable. *Shinrone, Inc. v. Tasco, Inc.*, 283 N.W.2d 280, 286 (Iowa 1979) (citation omitted). Dr. Perri's assertion that she could have treated 700 patients per month is premised on the assumption that demand for her medical services was high enough that 700 patients would seek treatment from her in any given month. Dr. Perri does not respond to defendant's contention that there is no evidence supporting this assumption. A lack of evidence supporting that assumption would not, however, render Dr. Perri's damages calculation "speculative."

Dr. Perri's damages calculation is not based on her purported ability to treat 700 patients in one month. Rather, the calculation is based on her demonstrated ability to treat between 500 and 650 patients per month over a three-month period.[16] (*See* Docs. 102, at 26-27; 85-10, at 162 (defendant's "Running Totals Report" for the 2016 fiscal year exhibit; document includes monthly number of patient visits); 106-1, at 62 (same exhibit offered by plaintiffs)). Although Dr. Perri opined that she could treat 700 patients per month if properly staffed, that opinion appears to have played no role in Dr. Perri's damages calculation.

In light of Dr. Perri's demonstrated ability to treat the volume of patients upon which her damages calculation is based, the Court does not view Dr. Perri's ability to

---

[16] The Court's reference to a "three-month period" is to the first quarter of the 2016 fiscal year, in which quarter Dr. Perri asserts she received a bonus of $58,357.00.

treat that volume as speculative. *See Netteland v. Farm Bureau Life Ins. Co.*, 510 N.W.2d 162, 167 (Iowa Ct. App. 1993) (finding lost profits were not speculative when based on competitors' revenue and expenses, as opposed to plaintiff's). Similarly, based on this demonstrated treatment volume, it appears that patient demand was sufficient, at least at times, to support Dr. Perri's ability to treat between 500 and 650 patients in one month.[17] *See id.* Dr. Perri's assumption as to patient demand, then, is also not based purely on speculation.

Defendant cites to Dr. Perri's average number of patient visits per month over the course of five years in support of its argument that Dr. Perri's damages calculation is "speculative." (*See* Doc. 85-1, at 27). Those numbers show that Dr. Perri treated, on average, between 389 and 565 patients per month. (*Id.*). That evidence exists to rebut Dr. Perri's damages calculation does not render the calculation "speculative." Rather, that evidence shows that there is a genuine dispute as to the amount of damages Dr. Perri sustained, if any. Defendant will have the opportunity to present this contrary evidence at trial, and the jury will be free to reject Dr. Perri's damages calculation, if it chooses to do so.

Similarly, defendant will have the opportunity to present evidence that Dr. Perri's variable expenses would have increased if she was provided with additional staff. In presenting this evidence, defendant can attempt to show the effect those additional variable costs would have had on Dr. Perri's total profit and, ultimately, compensation. That Dr. Perri may not have addressed variable costs in calculating her damages is not a reason to exclude those calculations. Dr. Perri has provided a calculation showing reasonably certain damages and the Court thus, **denies** defendant's motion, to the extent it seeks dismissal of Dr. Perri's lost profits claim for improperly speculative damages.

---

[17] The Court notes that during the 2016 fiscal year, there were only three months in which Dr. Perri treated fewer than 500 patients. (85-10, at 162; 106-1, at 62).

Defendant also argues that "Dr. Perri does not have sufficient personal knowledge to present her own alleged lost income damages and does not have the expertise to offer any opinion testimony." (Doc. 85-1, at 29). Defendant does not fully address why Dr. Perri may be unqualified to offer expert witness testimony on the issue of damages, and the Court has no indication, at this stage, as to whether plaintiffs intend to offer Dr. Perri as an expert witness on the issue of damages. The Court, thus, declines to rule on whether Dr. Perri's damages calculations would be admissible at trial as expert witness testimony.

The Court finds that Dr. Perri's damages calculations are based on information that may be within Dr. Perri's personal knowledge. "Unlike an expert witness, who may give his or her opinion about a matter within the witness'[s] expertise, a lay witness may testify only about matters within his or her personal knowledge." *Kemp v. Balboa*, 23 F.3d 211, 213 (8th Cir. 1994) (citations omitted). Federal Rule of Evidence 602 "prohibits a lay witness from testifying about matters that are not within the personal knowledge of the witness," and "excludes testimony concerning matter[s] the witness did not observe or had no opportunity to observe." *Id.* (citations and internal quotation marks omitted). Federal Rule of Evidence 701, however, permits lay opinion testimony if the opinion is "rationally based on the witness's perception," is "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 702 addresses expert witness testimony, which, as the Court explained above, is not an issue that has been fully briefed as it pertains to Dr. Perri's damages calculations.

The Court will assume, for the sake of argument, that defendant is correct in asserting that Dr. Perri's calculations are based on her opinions and, if Dr. Perri were to testify to those calculations at trial, that testimony would constitute opinion testimony, as opposed to fact testimony. (*See* Docs. 85-1, at 29; 110, at 11). Dr. Perri's damages calculations are based on information contained within the Running Totals Report that

was generated at the conclusion of the 2016 fiscal year. This Report, presumably, was provided to Dr. Perri. Assuming Dr. Perri examined the Report sufficiently to become knowledgeable about its contents, the information forming the basis for Dr. Perri's calculations would have been within her personal knowledge. Defendant has not shown—or argued—that Dr. Perri lacks personal knowledge of the contents of the Report or, specifically, about the number of patient visits and income data contained within the Report. Similarly, if Dr. Perri used the information contained within the Report to perform her damages calculations herself, Dr. Perri will have personal knowledge of the calculations, in addition to the information underlying the calculations. Thus, if Dr. Perri is able to lay a proper foundation at trial, her damages calculations will not be excluded under Rule 602 for lack of personal knowledge.

The Court will next consider whether Dr. Perri's damages calculations would constitute admissible opinion testimony. For purposes of this argument, the Court will assume that Dr. Perri would not qualify as an expert on the subject of damages. If Dr. Perri became knowledgeable about the contents of the Report, Dr. Perri's opinions formed from those contents would be rationally based on Dr. Perri's perceptions because she would have become knowledgeable about the contents by reviewing the Report in some fashion. Thus, Rule 701's first requirement is satisfied. *See* FED. R. EVID. 701(a).

As explained above, Dr. Perri must show that she sustained damages to recover on her breach of contract claim and, at the very least, provide a reasonable approximation of those damages, or a basis from which her damages can be calculated. *See Miller v. Rohling*, 720 N.W.2d 562, 572 (Iowa 2006) ("[I]f the uncertainty [of damages] is only in the amount of damages, a fact finder may allow recovery provided there is a reasonable basis in the evidence from which the fact finder can infer or approximate the damages." (citation and internal quotation marks omitted)). Dr. Perri's opinions would be helpful to determining those damages because Dr. Perri's opinions quantify the damages she

allegedly sustained. Should the factfinder find in Dr. Perri's favor on her staffing claim, Dr. Perri's opinions would assist the factfinder in quantifying Dr. Perri's damages. Thus, Rule 701(b) is capable of satisfaction. Finally, Dr. Perri's opinions employ simple addition and multiplication, neither of which is specialized knowledge requiring expert testimony. Thus, Rule 701(c) is also capable of satisfaction.

Because Dr. Perri may be able to satisfy all requirements for admissibility of her damages calculations, the Court cannot say, at this stage, that those calculations would be inadmissible at trial. Dr. Perri has, thus, produced sufficient evidence of her damages on her staffing claim for that claim to withstand defendant's motion for summary judgment. To the extent defendant seeks summary judgment on Dr. Perri's staffing claim based on Dr. Perri's inability to prove her damages, that motion is **denied**.

### iii.    Dr. Zahn-Hauser's Breach of Contract Claims

Finally, defendant moves for summary judgment on a portion of Dr. Zahn-Hauser's breach of contract claims. Dr. Zahn-Hauser's description of the claims that are subject to defendant's motion is consistent with defendant's arguments, but Dr. Zahn-Hauser's description provides additional background information:

> [I]n or around 2011, [defendant] reduced [Dr. Zahn-Hauser's] salary from $225,000.00 to $192,000.00 due to a deficit caused by [defendant's] failure to remove a nurse practitioner from Dr. Zahn-Hauser's clinic. Even though Dr. Zahn-Hauser promptly paid off the deficit, [defendant] did not increase her salary back to pre-2011 salary of $225,000.00.
>
>    In or around 2018, [defendant] also charged a deficit of approximately $54,000.00 to Dr. Zahn-Hauser—most if not all of which was incurred under a new payment arrangement implemented by [defendant] pursuant to the terms of a new proposed contract that [Dr. Zahn-Hauser] never signed.
>
>    On or about June 30, 2018, [defendant] agreed to buy out Dr. Zahn-Hauser's practice for $32,091.00, which was never paid to [Dr. Zahn-Hauser]. On or about October 1, 2018, [defendant] also acknowledged that it owed [Dr. Zahn-Hauser] $6,798.00, which was never paid to [Dr. Zahn-Hauser]. Despite[ ] acknowledging that it owed compensation of

$38,889.00, [defendant] has intentionally failed to pay that compensation to Dr. Zahn-Hauser.

(Doc. 85-4, at 260).

Defendant first argues that it had the contractual right to reduce Dr. Zahn-Hauser's draw amount and, thus, any reduction to her salary could not constitute a breach of contract. (Doc. 85-1, at 29-30). Defendant further argues that even if this could constitute a breach, Dr. Zahn-Hauser suffered no damages because any profits not paid to Dr. Zahn-Hauser via her salary were paid to her in the form of a bonus. (*Id.*, at 30). Defendant does not argue that it increased Dr. Zahn-Hauser's draw amount after the deficit was repaid.

Dr. Zahn-Hauser's theory appears to be slightly different than that contemplated by defendant. Dr. Zahn-Hauser is asserting that defendant's failure to remove the nurse practitioner from Dr. Zahn-Hauser's clinic constituted a breach of contract. (Doc. 102, at 27-28). Defendant does not presently contest whether that failure could constitute a breach. Dr. Zahn-Hauser also asserts that after she repaid the deficit brought on by defendant's failure to remove the nurse practitioner, defendant committed a second breach by failing to increase Dr. Zahn-Hauser's draw amount to $225,000. (*Id.*). Defendant does address this alleged breach.

Dr. Zahn-Hauser's Primary Care Physician Employment Contract provides, in relevant part, as follows:

> In the event Physician's Profit Center Balance is a negative number (reflecting a deficit), funds will be withdrawn from Physician's Reserve Fund to balance the deficit. If there are no funds in the Reserve Fund or if the funds in the Reserve Fund are insufficient to fully cover the deficit, Physician's Draw and Benefits will be reduced to an amount to be determined by the MPA Board. Subsequent reviews will be held on a monthly . . . basis until Physician's Profit Center Balance is a positive number (reflecting a surplus), at which time . . . the full amount of Physician's Draw and Benefits will resume.

36

(Doc. 85-3, at 222).[18]  The facts that the parties have presented show that Dr. Zahn-Hauser's draw amount was reduced to repay a deficit, and the Court is unable to tell whether that deficit was ever repaid.  Defendant has not addressed whether the deficit was repaid at some point, and Dr. Zahn-Hauser asserts that it was.  The financial records the parties have provided indicate that Dr. Zahn-Hauser's clinic operated at a deficit for at least some period of time (*e.g.*, Doc. 106-1, at 63), but the Court cannot tell, in the absence of an explanation from the parties, whether Dr. Zahn-Hauser ever repaid that deficit.  If she did not repay that deficit, defendant would not have been in breach by reducing Dr. Zahn-Hauser's draw and not increasing it again.  If, however, Dr. Zahn-Hauser did repay the deficit, then her draw amount should have increased upon full repayment.  The lack of information the Court has leaves the Court unable to tell whether defendant wholly abided by the terms of the contract in reducing Dr. Zahn-Hauser's draw amount and not increasing that draw amount at a later date.  Thus, summary judgment is improper on this basis.

Defendant also argues that it was proper for defendant to reduce Dr. Zahn-Hauser's draw amount because "[Dr.] Zahn-Hauser agreed to an annual salary (draw) of $180,003.20 starting July 1, 2011."  (Doc. 85-1, at 30).  If true, perhaps the Court could say with certainty that defendant's payment to Dr. Zahn-Hauser of $192,000.00 in salary (*see* 85-4, at 260), which is in excess of the $180,003.20 to which Dr. Zahn-Hauser allegedly agreed, was not in breach of Dr. Zahn-Hauser's contract.  The Court cannot, however, reach that conclusion.  The document to which defendant cites is a salary

---

[18] Similar language appears in an addendum that was executed approximately two years after Dr. Zahn-Hauser and defendant executed the initial contract.  (*See* Docs. 85-3, at 242; 95, at 129).  In making their arguments on this issue, however, both sides cite to Dr. Zahn-Hauser's original contract, and the Court will do so as well.  (*See* Docs. 85-1, at 29-30 (defendant's brief citing to Doc. 85-3, at 222-23); 102, at 27-28 (plaintiffs' brief citing to Doc. 95, at 88)).

election form for the 2013 fiscal year, beginning on July 1, 2012.[19] (Doc. 85-3, at 254). The allegedly improper salary reduction occurred in the preceding year. Thus, although defendant has produced evidence showing that Dr. Zahn-Hauser may have agreed to a reduced salary beginning on July 1, 2012, defendant has produced no evidence indicating that Dr. Zahn-Hauser agreed to a reduced salary at any time before July 1, 2012.

The Court is able to find, however, that there is no genuine dispute as to whether Dr. Zahn-Hauser agreed to a salary of $180,000.00 beginning on July 1, 2012, and continuing each year thereafter, until June 26, 2016. (Doc. 85-3, at 254, 256, 258, 260, 262). Dr. Zahn-Hauser does not contest whether she agreed to take a reduced salary, nor does she come forward with contrary evidence showing that she did not agree to a reduced salary. (*See* Doc. 102, at 28 ("The information [defendant] cites in its brief— that Dr. Zahn-Hauser decreased her draw to $180,003.20 starting on July 1, 2011 (beginning on fiscal year 2012)—supports Dr. Zahn-Hauser's argument since it shows she is reducing her draw amount to pay back a deficit.")). The salary election forms for the 2013 through 2017 fiscal years each bear what appears to be Dr. Zahn-Hauser's signature, and Dr. Zahn-Hauser has not challenged the validity or binding effect of any of these agreements. The Court thus finds that there is no genuine dispute as to whether Dr. Zahn-Hauser agreed to receive a salary of $180,000.00 beginning on July 1, 2012.

---

[19] The Court notes that the form indicates in four different places that the elections made on the form are intended to apply beginning on July 1, 2012. At the top of the form is a heading entitled "ANNUAL ELECTION FORM," and immediately beneath that heading is a subheading entitled "Fiscal Year 2013." (Doc. 85-3, at 254). Next, the form states "Provider's annual salary will be _____ starting July 1, 2012." (*Id.* (the blank on the FY13 form was filled in with "$180,000")). The form also refers to the 2012 fiscal year in the past tense: "Note: Your FY 2012 Quarterly Team Bonus Cap was $20,000." (*Id.*). Finally, the form indicates that it was to be returned to defendant's personnel file by "June 15, 2012." (*Id.*). Each of these instances shows that the form was not intended to be used for the 2012 fiscal year. Even if the form had been intended for use in the 2012 fiscal year, however, each of the three signatures on the form bears a 2012 date. (*Id.* (the dates are "6/14/12," "6[/]28[/]12," and "7/5/12")).

Whether Dr. Zahn-Hauser received a lesser salary than that agreed to is material because defendant seeks summary judgment on the basis that it paid Dr. Zahn-Hauser in accordance with the terms of her contract. Similarly, *when* Dr. Zahn-Hauser agreed to begin taking a lesser salary is material because defendant will not be absolved of liability for paying Dr. Zahn-Hauser less than the contracting parties agreed she would be paid during any given timeframe. The Court has concluded, however, that the timeframe during which Dr. Zahn-Hauser agreed to be paid a salary of $180,000.00 is also not genuinely in dispute. To the extent defendant seeks summary judgment that it was not in breach of contract for paying Dr. Zahn-Hauser a salary of $180,000.00 from July 1, 2012 until June 26, 2016, defendant's motion is **granted**. This summary judgment does not extend to plaintiffs' claims for lost profits on their claims that defendant breached their contracts by failing to provide appropriate staff.

The Court has no evidence from before July 1, 2012, as to whether defendant was in breach for paying Dr. Zahn-Hauser less than the amount it was contractually obligated to pay. This lack of evidence precludes the Court from finding that there is no genuine dispute as to whether defendant was in breach between July 1, 2011, and July 1, 2012. Thus, to the extent defendant moves for summary judgment that it paid Dr. Zahn-Hauser a salary in accordance with the terms of her contract between the dates of July 1, 2011, and July 1, 2012, defendant's motion is **denied**.

The Court notes two other discrepancies that do not preclude summary judgment on the time period from July 1, 2012 until June 26, 2016. First, defendant asserts in its brief that Dr. Zahn-Hauser agreed to accept a salary in the amount of $180,003.20. (Doc. 102, at 28). The form, however, indicates Dr. Zahn-Hauser's agreement to accept a salary in the amount of $180,000. The Court does not know why there is a discrepancy of $3.20 between the amount indicated on the form and the amount indicated in defendant's brief. Under the facts of this case, that discrepancy is not material because

it is a nominal figure and such a nominal figure, here, does not carry any special significance. Also, even if that difference were material, defendant has not presented any evidence showing Dr. Zahn-Hauser agreed to accept a salary of $180,003.20. Absent this evidence, the Court sees no genuine dispute that Dr. Zahn-Hauser agreed to a salary of any amount other than $180,000.00.

Dr. Zahn-Hauser also asserts that her salary was reduced to $192,000.00 in or around 2011. (Doc. 85-4, at 260). Dr. Zahn-Hauser uses this fact, however, to show that Dr. Zahn-Hauser became obligated to repay a deficit that was created by a *different* alleged breach. (*Id.*). Dr. Zahn-Hauser does not use this fact to show that defendant was obligated to pay Dr. Zahn-Hauser a salary in a different amount than the amount actually paid. The record evidence shows that the contracting parties agreed to increase Dr. Zahn-Hauser's salary from $180,000.00 to $192,000.00 beginning in the 2017 fiscal year. (Doc. 85-3, at 262). There is simply no evidence, other than Dr. Zahn-Hauser's answer to an interrogatory, that the contracting parties agreed to the higher salary of $192,000.00 at any point before the 2017 fiscal year. Thus, the Court finds that there is no genuine dispute as to the time at which the contracting parties first agreed that Dr. Zahn-Hauser would receive a salary of $192,000.00.

Even the discrepancies the Court has noted, considered together, do not create a genuine dispute as to whether Dr. Zahn-Hauser agreed to a salary of $180,000.00, and the time during which she agreed to receive that salary. The numerosity of discrepancies, no matter how slight, causes the Court to pause in considering whether to accept, at face value, the evidence showing that Dr. Zahn-Hauser agreed to receive a salary of $180,000.00 from July 1, 2012, until June 26, 2016. Ultimately, the Court has decided to accept this record evidence because even the entire body of discrepancies does not discredit the material facts contained in the record evidence, and the parties have not indicated that these discrepancies show the inaccuracy of the record evidence.

Next, defendant argues that even if it did improperly pay Dr. Zahn-Hauser less than the salary she was contractually entitled to, Dr. Zahn-Hauser suffered no damages because any compensation not paid to her as salary would have been paid to her, in the same amount, in the form of a bonus. (Doc. 85-1, at 30 ("Dr. Zahn-Hauser received her profit center earnings—if not deducted as a draw, money would flow to her pocket through profit center earnings.")). Based on the Court's understanding of the compensation system, defendant's assertion is incorrect. Josef Link, an accountant employed by defendant (Doc. 85-4, at 16), testified on how profits are distributed when paid as bonuses. Of the funds available for bonuses in a physician's profit center, forty-five percent of those funds would be payable to the physician, a portion would be paid to the physician's staff, and a portion would be paid to defendant. (*Id.*, at 19). Thus, if Dr. Zahn-Hauser's salary was reduced and the funds that would have been paid to her in salary form flowed, instead, to her profit center for distribution as bonuses, Dr. Zahn-Hauser would receive only forty-five percent of the funds she would have received had they flowed directly to her as part of her salary.

Although Mr. Link testified that "[i]n [his] time, [defendant] has never taken a share of [a bonus] payment," Mr. Link also testified that a certain portion of the funds allocated for bonuses are distributed as bonus payments to staff. (*Id.*). Even if defendant did not receive a portion of the funds apportioned for bonuses, Dr. Zahn-Hauser still would not have received all of those funds because a portion would have been paid to her staff. (*See also* Doc. 86-1, at 16 (defendant's motion for decertification, explaining that Dr. Perri, at one point, "increase[d] her draw in order to reduce the bonus [that] otherwise would have resulted for staff within her practice")). Defendant has neither alleged nor shown that Dr. Zahn-Hauser's staff did not receive a bonus. Thus, a portion of the funds allocated for bonuses could have been paid to staff, which would have reduced Dr. Zahn-Hauser's total compensation to less than she would have received had

she been paid a higher salary. As explained above, Dr. Zahn-Hauser's compensation is a material fact on the issue of damages as to her breach of contract claim, and Dr. Zahn-Hauser could have received less compensation than she would if her salary had not been reduced improperly. Defendant's argument, then, that Dr. Zahn-Hauser could not suffer any damages by taking a reduced salary is mistaken, and defendant is not entitled to summary judgment on this basis.

The Court will now turn to Dr. Zahn-Hauser's allegations that 1) defendant agreed to buy Dr. Zahn-Hauser out of her practice but never paid her the sum agreed upon, 2) defendant owed Dr. Zahn-Hauser $6,798.00 that was never paid to her, and 3) defendant improperly charged a $54,000.00 deficit to Dr. Zahn-Hauser. (Doc. 102, at 28-29). Defendant argues that it is entitled to summary judgment on these claims because it would have become obligated to pay those sums only if defendant and Dr. Zahn-Hauser had entered into a new contract that contemplated those payments. (Doc. 85-1, at 30-31). Similarly, defendant asserts that the $54,000.00 deficit was incurred under the terms of the old contract that was executed and, thus, defendant is entitled to seek repayment of that deficit.[20] (*Id.*, at 31).

The parties agree that the contract was never executed in writing. (*Id.*; Docs. 85-3, at 192 (Dr. Zahn-Hauser's deposition, offered by defendant); 102, at 28 (plaintiffs' brief, also citing to Dr. Zahn-Hauser's deposition)). Dr. Zahn-Hauser asserts, however,

---

[20] It is not clear what type of summary relief defendant is seeking as to the $54,000.00 deficit. Dr. Zahn-Hauser does not appear to be seeking any damages in conjunction with this deficit, and although defendant filed a counterclaim seeking repayment of the deficit, defendant has not moved for summary judgment on that counterclaim. (Doc. 63, at 23-28). Thus, defendant has raised the issue of the deficit, but defendant has not requested any sort of relief relating to that issue. The Court finds it helpful to address the deficit in this section, however, because whether that deficit is owed to defendant turns, in part, on whether the parties entered into the new contract under which the deficit allegedly became due. This is the same issue that is implicated by Dr. Zahn-Hauser's assertions that she was owed a practice buyout and the $6,798.00.

that defendant implemented at least some of the new contract terms, including a different compensation system than that employed under Dr. Zahn-Hauser's previous contract, even absent the contract having been executed. (Doc. 102, at 28-29).

The parties' arguments implicate contract formation issues. The formation of a contract requires mutual assent, and the parties to a contract can express their mutual assent through an offer and acceptance. *Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 26 (Iowa 1997). Under Iowa law, a party will be deemed to have accepted a contract—despite having never signed it—when he accepts the benefits of the contract and the circumstances indicate he was performing the contract. *Phone Connection, Inc. v. Harbst*, 494 N.W.2d 445, 448 (Iowa Ct. App. 1992) ("The parties to an unsigned agreement are obligated to abide by the agreement, when the acceptance appears from the acts of the parties."); *see also Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010) ("'For a contract to be valid, the parties must express mutual assent to the terms of the contract,'" which is "present when it is clear from the objective evidence that there has been a meeting of the minds." (quoting *Schaer v. Webster Cty.*, 644 N.W.2d 327, 338 (Iowa 2002))).

As noted above, the parties agree that the contract was never signed. The parties also agree, however, that Dr. Zahn-Hauser continued working for defendant even after the new contract went unexecuted, and that defendant paid Dr. Zahn-Hauser in accordance with the terms of the new contract. (Doc. 85-3, at 192 (Dr. Zahn-Hauser's deposition, cited by both parties). *See also* Docs. 85-1, at 30-31; 102, at 28). The Court does not have enough facts to determine whether the parties' actions were sufficient to indicate acceptance of the new contract. Although these facts indicate that the parties may have performed under the new contract, the Court cannot find, on this record, that it is "clear" that there was a meeting of the minds as to the new contract. *Royal Indem. Co.*, 786 N.W.2d at 846.

For instance, the Court has not been informed as to whether any of the parties' obligations, other than payment, changed under the terms of the new contract, as compared to the old contract. If so, non-performance of those new obligations could show that the parties did not, in fact, enter into the new contract by their actions. Thus, defendant has not met its burden to show that there is no genuine dispute as to whether the parties entered into the new contract, and summary judgment is inappropriate on Dr. Zahn-Hauser's claimed entitlement to a practice buyout, the $6,798.00 Dr. Zahn-Hauser is allegedly owed, and, to the extent defendant has brought a motion, any issue concerning the $54,000.00 deficit. Defendant's motion for summary judgment is **denied** as to these issues.

### C. *Summary Judgment Conclusion*

To the extent defendant seeks summary judgment that it was not in breach of contract for paying Dr. Zahn-Hauser a salary of $180,000.00 from July 1, 2012, until June 26, 2016, defendant's motion is **granted**. This summary judgment does not extend to plaintiffs' claims for lost profits on their claims that defendant breached their contracts by failing to provide appropriate staff. Defendant's motion for summary judgment is **denied** as to all other issues.

## V. *DECERTIFICATION*

### A. *Legal Background*

The FLSA permits plaintiffs asserting a claim under the Equal Pay Act to proceed collectively, if those plaintiffs are "similarly situated." 29 U.S.C. § 216(b). *See also Salazar v. Agriprocessors, Inc.*, No. 07-CV-1006-LRR, 2008 WL 782803, at *3 (N.D. Iowa Mar. 17, 2008) ("An employee may bring an FLSA action on behalf of himself and any other 'similarly situated' employees."). This Court has previously employed a two-step process in determining whether to certify a collective action under the Equal Pay Act, and the Court employed that same process in this case. *Bertroche v. Mercy*

*Physician Assocs., Inc.*, No. 18-CV-59-CJW, 2018 WL 4107909, at *2 (N.D. Iowa Aug. 29, 2018). *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 890-91 (N.D. Iowa 2008).

At the first step of that process, the Court conditionally certified this case as a collective action, finding that Dr. Bertroche had met her burden of showing "other potential plaintiffs exist[ed] who may have been discriminated against on the basis of their gender, just as [Dr. Bertroche] allege[d] she was." *Bertroche*, 2018 WL 4107909, at *3. In doing so, the Court noted that, at that time, the parties had engaged in little discovery relating to Dr. Bertroche's Equal Pay Act claim, and the parties, thus, had little evidence to rely on in arguing whether the Court should conditionally certify this case. *Id.* The parties have now engaged in substantial additional discovery,[21] much of which targeted plaintiffs' Equal Pay Act claims, and, based on the information now available, the Court finds that plaintiffs have not met their burden of showing that they should be permitted to maintain collective status. *See Bouaphakeo*, 564 F. Supp. 2d at 893.

"Conditional certification at the first step requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy[,] or plan." *Id.* at 892 (citations and internal quotation marks omitted). To maintain certified status at the second stage, however, plaintiffs are tasked with making a heightened showing:

> At the second step, or final stage, plaintiffs seeking to maintain an
> opt-in class action bear the burden to show that they are similarly situated

_____

[21] Although it appears that the parties may not have completed discovery at this time, the evidence submitted in connection with the motions now before the Court show that the parties have engaged in a great deal of discovery. (*See* Doc. 114 (motion showing that expert witness discovery is ongoing)). The evidence before the Court is sufficient for the Court to make an informed decision on whether to decertify this action, and no party has indicated that additional discovery would be beneficial in deciding this issue.

with respect to their job requirements and pay provisions. This showing is usually required after a collective action has been conditionally certified and upon the defendant's motion to decertify, or after the close of discovery, or at least where discovery is largely complete and the matter is ready for trial. Although the plaintiff's burden at this final stage is more strict than at the notice stage, the plaintiff need not show that opt in plaintiffs are "identically situated." The [C]ourt considers three factors to determine whether plaintiffs remain similarly situated at the final stage. These factors include: [1)] the employment and factual settings of plaintiffs; 2) the various defenses available to defendants; and 3) considerations of fairness, procedure, and manageability. The district court must assess these factors in light of the fundamental purpose of 29 U.S.C. § 216(b): 1) to lower costs to the plaintiffs through the pooling of resources; 2) to limit the controversy to one proceeding [that] efficiently resolves common issues of law and fact that arose from the same alleged activity.

     . . . [T]he level of proof required at each stage in the FLSA collective action certification process is largely dependent upon the amount of information before the court. . . . At the second step, the court has much more information and is in a position to make a factual determination on the similarly situated question, and therefore plaintiffs must clear a higher hurdle to continue. The stricter post-discovery standard requires plaintiffs to convince the court that the factual record reveals putative plaintiffs are still similarly situated to existing plaintiffs. Finally, and importantly, whether at the first or second step in the § 216(b) collective action certification process, plaintiffs need not prove the merits of their claim. That is, plaintiffs do not have to show that the employer actually violated the FLSA.

*Id.* at 892-94 (footnote, internal citations, quotation marks, and alterations omitted). Further, "[p]laintiffs may be similarly situated when they suffer from a single FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir. 2014) (citation and internal quotation marks omitted). Whether to certify a collective action lies within the sound discretion of the district court. *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001), *parenthetically*

*cited with approval in Bouaphakeo*, 765 F.3d at 796.

## B.    Discussion

In arguing that they should be permitted to maintain collective status at this second stage, plaintiffs argue that the compensation scheme under which each plaintiff was paid was, itself, discriminatory. (*See* Doc. 92-1, at 6, 7, 10). Thus, plaintiffs' theory is that they are entitled to proceed as a collective because a showing that the compensation scheme was, in fact, discriminatory, would entitle each plaintiff to relief under the Equal Pay Act, without any further showing. In addressing defendant's motion for summary judgment, the Court found that even if each of defendant's physicians was paid according to the same compensation scheme, a reasonable jury could find that the variables inputted into the compensation formula could differ such that sex-based discriminatory compensation resulted. Because the Court made this finding, the Court did not need to reach the issue of whether the compensation scheme could, itself, be discriminatory, nor must the Court reach that issue now.

Plaintiffs' adoption of the theory that the compensation scheme, under which each plaintiff was paid, was the source of the alleged discrimination weighs in favor of permitting plaintiffs to proceed collectively. As detailed above, the parties agree that each plaintiff was paid according to the same compensation scheme. Plaintiffs intend to offer proof that payments made under the compensation scheme were violative of the Equal Pay Act. This does not necessarily involve an individualized inquiry as to whether each plaintiff was discriminatorily paid because plaintiffs are not arguing that the compensation scheme was applied differently to any of the plaintiffs than it was applied to non-parties. Rather, plaintiffs' theory is focused on the compensation scheme itself, which is common to all plaintiffs. Thus, proof of plaintiffs' theory—that the compensation scheme is, itself, discriminatory—could also prove that each plaintiff suffered a violation of the Equal Pay Act. On the other hand, evidence of defendant's

alleged inadequate staffing of each plaintiff's office that adversely impacted compensation, for example, may differ for each plaintiff.

The Eighth Circuit Court of Appeals has held that when proof of a single policy, or of conduct in conformity with that policy, shows a violation as to all plaintiffs, those plaintiffs may be similarly situated for purposes of the Equal Pay Act. *Bouaphakeo*, 765 F.3d at 796 (citation omitted). Although this consideration is not decisive of whether plaintiffs, here, are similarly situated, the common theory plaintiffs have adopted weighs in favor of permitting plaintiffs to proceed collectively.[22]

Plaintiffs further argue that they are all similarly situated from a factual and employment standpoint because they "each performed substantially similar job duties." (Doc. 92-1, at 9). As discussed above, the Court has found that there is a genuine issue of material fact as to whether plaintiffs' jobs were substantially equal to those of their male counterparts. The Court now adds that there is a genuine issue, for the same reasons, as to whether each plaintiff's job was substantially equal to the jobs of the other two plaintiffs. This, however, is not the inquiry the Court must make in assessing whether to decertify the collective. In considering whether plaintiffs are similarly situated to each other, the Court does not need to make a finding that each plaintiff held a job that was "substantially equal" to the job held by each of the other two plaintiffs. Rather, the Court must look at plaintiffs, themselves, and, considering the employment and factual settings of plaintiffs, determine whether they are "similarly situated" to each other.

For purposes of certification, the Court finds that plaintiffs' employment and

---

[22] Plaintiffs state that "[t]he issue before the Court . . . is whether [p]laintiffs *and their male colleagues* are sufficiently similarly situated to maintain their collective status." (Doc. 92-1, at 9 (emphasis added)). The relevant issue, however, is whether plaintiffs are sufficiently similarly situated to *each other* to maintain their collective status. *Bouaphakeo*, 765 F.3d at 796. Even though plaintiffs misstate the issue, plaintiffs' arguments largely translate to whether they are sufficiently situated to each other, and plaintiffs' arguments, as made, are beneficial to the Court's analysis.

factual settings weigh in favor of permitting plaintiffs to proceed collectively. Defendant's defense that differences in total compensation resulted from different choices made by each physician, however, weighs in favor of decertification to an equal degree. Thus, these factors balance each other out.  Each plaintiff's contract sets forth the same "Primary Care Physician Duties."  (Doc. 85-3, at 49-54 (Dr. Bertroche contract), 147-52 (Dr. Perri contract), 212-17 (Dr. Zahn-Hauser contract)).  Although these contractual similarities weigh in favor of a finding that plaintiffs are similarly situated, defendant has presented evidence that each plaintiff, in performing her job, conducted herself differently than the other two plaintiffs and thereby generated different profits. Defendant's evidence relating to profit generating capability weighs against plaintiffs' contractual evidence, and neither consideration weighs more heavily than the other.

Specifically, defendant returns to the notion that plaintiffs were paid under a profit-based compensation scheme.[23]  (Doc. 86-1, at 14-19).  Defendant argues that because the compensation scheme was designed to account for each physician's different medical and business decisions, plaintiffs were able to make different medical and business decisions. Because each plaintiff chose to make decisions that were different from those made by the other two plaintiffs and that resulted in different total compensation amounts, defendant reasons, plaintiffs cannot be similarly situated to each other for purposes of the Equal Pay Act.[24]

---

[23] Defendant also references the new contract that was allegedly offered to Dr. Zahn-Hauser and that she allegedly rejected.  (Doc. 86-1, at 20).  Defendant does not explain the relevance of this notation, and the Court fails to see the relevance absent an explanation.

[24] In addressing and attributing weight to this argument, the Court is not attributing duplicative weight to the compensation scheme.  Above, the Court addressed plaintiffs' argument that the compensation scheme was, as a whole, discriminatory.  Here, the Court is addressing defendant's argument that plaintiffs were able to make different decisions under the common compensation scheme and that it was these decisions that differentiates each plaintiff from the other two plaintiffs.

It appears that each plaintiff did make different decisions from each of the other two plaintiffs on how to operate her medical practice, and plaintiffs do not argue otherwise. Dr. Bertroche, for example, provided her patients with obstetrics services (Doc. 85-3, at 29), but there is no indication that either Dr. Perri or Dr. Zahn-Hauser provided these services. The medical staff employed by each plaintiff, and how those staff members were compensated, also varied between the three plaintiffs. Dr. Perri, for instance, elected to increase her own salary, which reduced the funds available to be used for staff bonuses, including for her physician's assistants. (*Id.*, at 97). Dr. Bertroche also employed a physician's assistant, for some period of time. (*Id.*, at 15). That Dr. Bertroche, like Dr. Perri, employed a physician's assistant weighs in favor of finding that Drs. Bertroche and Perri are similarly situated, but the variations in the number of staff members employed and how they were compensated weighs against a finding that the two are similarly situated.

Although defendant argues that turnover experienced by each plaintiff shows that the three plaintiffs are not similarly situated, the Court disagrees. Defendant points out that both Drs. Perri and Zahn-Hauser experienced some degree of turnover (Doc. 86-1, at 17-18), which, if anything, would suggest that those two plaintiffs are more similarly situated to each other than they would be absent turnover.

Defendant also urges the Court to find that Dr. Perri is not similarly situated to the other two plaintiffs because her profit center was "unique" by its inclusion of a second physician. (*Id.*, at 19-20). This is a valid point. It is not clear, on the current record, how the second physician's inclusion would have affected Dr. Perri's profit center, but it is reasonable to presume it did.

The Court finds *Ahad v. Board of Trustees of Southern Illinois University* persuasive. In that case, the Central District of Illinois opined that "[i]t is of course almost always true that any two or more physicians will have substantially similar medical

educations and residencies and general job responsibilities that include some measure of patient care and administration." No. 15-cv-3308, 2019 WL 1433753, at *4 (C.D. Ill. Mar. 28, 2019) (alterations and internal quotation marks omitted). The *Ahad* court went on to find that in spite of these similarities, the different ways in which physicians operate their medical practices can serve to differentiate them from one another such that they should not be able to proceed collectively. *Id.*, at *4-6. The argument that court rejected is the same argument plaintiffs in this case advance. That is, plaintiffs argue that they are all similarly situated, in part, because each plaintiff's contract sets forth the same basic responsibilities for patient care. (*See* Doc. 92-1, at 6-7, 9-11). This Court agrees with the *Ahad* court's rationale and, further, finds that the differences in each plaintiff's medical practice, as are discussed more fully herein, are substantial enough to differentiate plaintiffs from each other. Thus, the dissimilarities in plaintiffs' medical practices weigh in favor of decertifying the collective.

All three plaintiffs worked for defendant in the Cedar Rapids, Iowa area, though Dr. Perri worked at a different clinic location than Drs. Bertroche and Zahn-Hauser. (Docs. 85-3, at 15, 121, 189). This factual similarity weighs in favor of certification, though only marginally, because differences in locale do not appear to be a significant issue in this case. The Court also notes that while Dr. Perri working at a different clinic location weighs against certification, this consideration is outweighed by each physician maintaining her practice in the Cedar Rapids area.

In addressing the impact its affirmative defense will have on the evidence presented at trial, defendant asserts that it will seek to admit "individual proof" as to each plaintiff to show that each plaintiff's compensation was based on a factor other than sex. (Doc. 86-1, at 21). Similarly, defendant argues that consideration of fairness and procedural concerns counsel against certification because certification would lead to a single trial for claims that should be tried in three separate trials. (*Id.*, at 23-24). Notably, defendant

only moves for decertification of the collective action and dismissal of the opt-in plaintiffs' Equal Pay Act claims. (*See* Docs. 86, at 2 (prayer for relief stating: "Defendant respectfully requests that the Court enter an Order decertifying the collective action, dismissing the opt-in plaintiffs' Equal Pay Act claims, and granting whatever additional relief the [C]ourt deems just and necessary"); 86-1, at 24 (same); 98, at 17 (same)). Defendant does not seek dismissal of any of the state law claims.

The Court anticipates that, at trial, the parties will seek admission of much of the same evidence for the state law claims that they would seek to admit in litigating the opt-in plaintiffs' Equal Pay Act claims. The state law claims are derived from a different premise than the Equal Pay Act claims, but all of the claims in this case are centered on the compensation scheme under which each plaintiff was paid. It is this common focus that indicates that the evidentiary overlap between the Equal Pay Act claims and the state law claims will be substantial.

Dr. Perri's claims for breach of contract for inadequate staffing provides an example of the type of overlap the Court would expect to see. Dr. Perri's theory is that her compensation was lower than it should have been, in part, because defendant failed to provide Dr. Perri with appropriate staff, as contemplated in her "Primary Care Physician Employment Agreement." Because Dr. Perri was provided with allegedly inadequate staff, Dr. Perri was not able to treat as many patients as she would have been able to treat with proper staff. This, Dr. Perri argues, caused her compensation to be less than what it should have been. Defendant defends against Dr. Perri's Equal Pay Act claim by arguing that Dr. Perri's compensation was lower because she did not treat as many patients as many of her colleagues. Both sides would seek to prove their positions by presenting evidence on the number of patients Dr. Perri treated and the compensation Dr. Perri realized as a result. Dr. Perri would also likely seek to introduce evidence that the staff with which she was provided was not sufficient to meet the terms of her contract.

Even considering this additional evidence that Dr. Perri would likely seek to introduce, the overlap as between these claims would be substantial.

Likewise, each plaintiff's breach of contract and Chapter 91A claims invoke, to some degree, the compensation scheme developed under the "Primary Care Physician Employment Agreements," as do defendant's counterclaims against Drs. Perri and Zahn-Hauser. Plaintiffs' position, in part, as to their breach of contract and Chapter 91A claims is that the compensation scheme is so complicated that they do not know whether they were properly compensated and, thus, plaintiffs seek any wages owed to them that have not been paid. Defendant, in its counterclaims, takes the position that Drs. Perri and Zahn-Hauser were over-compensated under the compensation scheme and, thus, are indebted to defendant in the amount of that over-compensation. (Doc. 63, at 20-28). The facts implicated by these positions oppose each other nearly identically, and the evidence that the parties will use to address the compensation scheme under the Equal Pay Act claim will largely be the same as the evidence the parties will likely use to establish their state law claims that are premised on the compensation scheme.

Even so, this factual and evidentiary overlap is not enough to persuade the Court that the opt-in plaintiffs' claims should be tried together with Dr. Bertroche's claims. In spite of the overlap, each plaintiff's claims are premised on largely different and unique evidence. Plaintiffs are pursuing, at this point, the common theory that the compensation scheme is discriminatory. Beyond that common theory, however, each plaintiff's claim for relief is premised on a different set of facts. Dr. Perri's claims, as discussed above, focus heavily on her staffing claim. Although the staffing issue may have been raised by the other two plaintiffs, staffing does not appear to be a significant aspect of their claims.

Notably, the factual differences present as to the state law claims are also present as to the Equal Pay Act claims. If plaintiffs are unable to prove their common theory that the compensation scheme is, itself discriminatory, plaintiffs will have to show that

the compensation scheme had a discriminatory effect, if plaintiffs are to succeed on their Equal Pay Act claims. Because the compensation scheme looks at the specific factual situation of each physician's practice, pursuing this avenue will require each plaintiff to present evidence that is specific to her medical practice.

Even if plaintiffs' common theory does succeed, each plaintiff will have to present evidence of her damages. The Equal Pay Act permits a successful plaintiff to collect damages in the amount that she would have received absent the discriminatory wage rate. *Ashley*, 66 F.3d at 168. As such, each plaintiff will have to show what her compensation would have been if she had been compensated at the same rate as her male counterpart(s). This would require each plaintiff to turn to the compensation scheme to calculate what her total compensation would have been, based on her specific medical practice. Thus, if this case were to proceed collectively, each plaintiff would be presenting different evidence to prove her claim and her damages, if any.[25] Considering the first and third factors set forth in *Bouaphakeo*, the necessity of individualized evidence weighs heavily against permitting plaintiffs to proceed collectively, as does the extent of the factual differences between plaintiffs' claims.

Considering all of the factors together, the issue of whether to permit plaintiffs to proceed collectively is a close call. On balance, however, the Court finds that plaintiffs should not be permitted to proceed collectively. This is especially so considering the interest in seeking "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Although plaintiffs' claims do share some common

---

[25] Defendant asserts that it would be unfair for defendant to have to defend against uncommon evidence in a single trial. (Doc. 86-1, at 23-24). Defendant is correct that there would be some uncommon evidence presented at trial. Defendant does not, however, explain why it would be unfair for defendant to defend against this evidence in a single trial. Thus, the Court has not weighted defendant's fairness argument in finding decertification appropriate.

issues of law and fact, those common issues extend only to the compensation scheme, and each plaintiff's specific factual situation serves to differentiate her claims from the other two plaintiff's claims. In short, the factual overlap between plaintiffs' claims begins and ends with the compensation scheme. This compensation scheme, and the individual factors influencing the compensation and contract claims, are very complex. It will be difficult for a jury to absorb and understand the claims and issues for a single doctor; asking a jury to keep track of and differentiate between each of the three plaintiff's claims is asking too much. Weighing all relevant factors together, the Court, in its discretion, finds that plaintiffs should not be permitted to proceed collectively. Defendant's motion for decertification (Doc. 86) is **granted**.

Typically, when a motion for decertification is granted, the opt-in plaintiffs' claims are dismissed without prejudice. *See Hipp*, 252 F.3d at 1218 (citation and internal quotation marks omitted). Here, however, the parties agree that because this case is at a late stage and has proceeded through discovery and dispositive motions, this remedy would be inefficient and would result in wasted resources. At oral argument, defendant stated that it would have no objection to permitting Drs. Perri and Zahn-Hauser's claims to survive but proceed to trial separately from Dr. Bertroche's claims.[26] Thus, consistent with the parties' positions on this issue, in lieu of dismissing the opt-in plaintiffs' claims, the Court will bifurcate those claims for trial under Federal Rule of Civil Procedure 42.[27]

---

[26] During oral argument, defense counsel stated that there would be no objection to "severance," in the alternative to dismissal. Use of this term could indicate that counsel was considering Rule 21's procedure for severing claims into separate independent actions. *See Costa Cruises, Inc. v. Caribbean Tours & Cruises, Inc.*, n.1. Here, there would be no material difference between severing Drs. Perri and Zahn-Hauser's claims under Rule 21 and bifurcating those claims for trial under Rule 42. *See id.* In the absence of a material difference, the Court finds it more appropriate to maintain all claims in the same action and to order Drs. Perri and Zahn-Hauser's claims to proceed to trial separately from Dr. Bertroche's claims.

[27] Plaintiffs argue, in the alternative, that if the Court were to decertify the collective, each

In determining whether to order separate trials under Rule 42, the Court enjoys broad discretion, and the Court's "ruling will not be disturbed on appeal in the absence of a clear abuse of discretion." *Chicago, R.I. & P.R. Co. v. Williams*, 245 F.2d 397, 404 (8th Cir. 1957). Rule 42(b) provides that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more . . . claims . . . ." In decertifying the collective, the Court explained the factual differences between each plaintiff's claims. Those same factual differences would make for an inefficient use of the parties' and Court's time and resources, if plaintiffs' claims were tried in a single trial. Because each plaintiff would have to present such a large amount of individualized evidence, a single trial would, essentially, be comprised of three sub-trials, in which each plaintiff would seek to prove her case. Aside from being confusing for the jury, it would be inefficient to try three cases simultaneously, before the same jury. Thus, the Court finds it appropriate for each plaintiff's case to be tried separately.

Dr. Bertroche's claims will proceed to trial as currently scheduled, and separate trial management orders will issue setting new trial dates for Dr. Zahn-Hauser's claims and for Dr. Perri's claims. No new scheduling orders will issue. The parties are to confer and contact the Court's Judicial Assistant by Monday, September 23, 2019, with a proposal for the order of, and dates for, the remaining two trials.

---

plaintiff's claims should be permitted to proceed because Drs. Perri and Zahn-Hauser were permissively joined to this action under Federal Rule of Civil Procedure 20. The Court need not address plaintiffs' Rule 20 argument because the Court is permitting Drs. Perri and Zahn-Hauser's claims to proceed to trial. Further, even if Drs. Perri and Zahn-Hauser were joined under Rule 20, the Court would still order their claims to be tried separately from Dr. Bertroche's claims.

## VI.    CONCLUSION

For the reasons set forth above, defendant's Motion for Summary Judgment (Doc. 85) is **granted in part and denied in part**, defendant's Motion to Decertify the Collective Action (Doc. 86) is **granted**, and plaintiffs' Motion to Strike (Doc. 114) is **denied**.

**IT IS SO ORDERED** this 11th day of September, 2019.

_____
C.J. Williams
United States District Judge
Northern District of Iowa